# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---
## NO. 03-09-00576-CV
---

**Appellant, Stanley Shook// Cross-Appellants, Terry Walden and Joy Walden**

**v.**

**Appellees, Terry Walden and Joy Walden// Cross-Appellees, Stanley Shook,
Patrick Jaehne and S&J Endeavors, L.L.C.**

---
**FROM THE DISTRICT COURT OF BASTROP COUNTY, 335TH JUDICIAL DISTRICT
NO. 26,747, HONORABLE H. R. TOWSLEE, JUDGE PRESIDING**
---

## O P I N I O N

The principal issue presented in this appeal concerns the power of courts to disregard the separate existence of a Texas limited liability company (LLC) under the equitable "veil-piercing" principles that have evolved in regard to business corporations. Specifically, we must determine whether, assuming these principles can be applied to LLCs, a claimant seeking to "pierce" an LLC's "veil" with respect to the entity's contractual liabilities must prove—as has long been required by statute when piercing the veil of a business corporation—that the person against whom liability is sought to be imposed used the LLC to perpetrate actual fraud for the person's direct personal benefit. Although the Texas Legislature has recently addressed this issue through amendments to the business

organizations code that specifically extended the statutory standards governing veil piercing of corporations to LLCs,[1] the case on appeal is among those governed by prior law.

Under prior law, we conclude that courts must resolve the question the same way the Legislature eventually did—the veil of an LLC may be pierced with respect to the entity's contractual liabilities only upon proof that the defendant used the LLC to perpetrate actual fraud for the defendant's direct personal benefit.

## BACKGROUND

The underlying dispute centers on a real property sale and home construction project that both went awry. On September 19, 2006, appellees and cross-appellants Terry and Joy Walden, then residents of Washington state, signed a pair of contracts with a homebuilding and real-estate development company, cross-appellee S&J Endeavors, LLC. In one of the contracts (the "Land Contract"), S&J agreed to convey to the Waldens, via general warranty deed, a residential lot in the western Bastrop County subdivision known as "The Colony" (the "Lot") in exchange for a payment of $62,000. The Land Contract further provided that S&J was to furnish the Waldens with a survey of the Lot within seven days after the contract's effective date. The transaction was to close on the later of September 25, 2006, or within seven days after any objections to title defects, exceptions, or encumbrances revealed on the survey were cured or waived. In the event the sale did not close by the specified date, the Land Contract afforded the Waldens the rights either to terminate the contract or enforce it through specific performance.

---

[1] Act of Apr. 20, 2011, 82d Leg., R.S., ch. 25, §§ 1-2, 2011 Tex. Gen. Laws 45, 45 (current version at Tex. Bus. Orgs. Code Ann. § 101.002 (West Pamph. 2011)).

In the second contract (the "Construction Contract")—comprised of both a Texas Association of Builders form contract and an addendum drafted by the Waldens[2]—S&J agreed to build a single-family residence on the Lot according to agreed-upon plans and specifications. In exchange, the Waldens agreed to pay S&J the builder's costs plus twelve percent profit. The Construction Contract also stated that the total "Contract Price" was not to exceed $429,000. The Waldens and S&J would later dispute whether or not the "Contract Price" served to limit S&J's recoverable profit.

S&J had been formed in 2002.[3] It had two members who were also its sole managers, appellant and cross-appellee Stanley Shook and cross-appellee Patrick Jaehne—hence the name "S" (Shook) and "J" (Jaehne). The Shook-Jaehne relationship was not limited to business—Jaehne was married to Shook's daughter until shortly before trial, and evidently this familial relationship had helped spur the formation of the business. According to Shook's testimony at trial, he had "set up" S&J following the marriage, including investing roughly $200,000 in the entity, to enable his new son-in-law to launch a business "building houses" so he could "make a good living," a decision driven "100 percent" by the fact that Jaehne was now his daughter's husband.[4] Shook depicted his role in S&J thereafter as merely that of a passive investor.[5] Although the Waldens would later

---

[2] The Waldens had operated their own residential construction business in Washington.

[3] At the time of formation, the entity's name was "S&J Investments, LLC." The name was changed to the current S&J Endeavors, LLC, in 2004.

[4] Prior to the marriage, Jaehne had acquired experience in handling construction and remodeling projects. He also held a real estate license.

[5] In Shook's deposition, which was admitted into evidence, Shook described his role with S&J as "Silent Partner." Upon further questioning, he indicated that Jaehne had the position

dispute that characterization, emphasizing such facts as S&J's use of Shook's residence as its mailing address, Shook's status as one of only two managers and members of the entity, Shook's signature on some of S&J's checks, and a handful of occasions in which Shook had contributed his own handiwork to the construction project,[6] it is undisputed that Jaehne handled virtually all of the business's day-to-day operations. True to form, it was Jaehne rather than Shook who had executed both the Land Contract and the Construction Contract with the Waldens on S&J's behalf.

Upon signing the two contracts on September 19, 2006, the Waldens transmitted a $62,000 check to S&J in payment for the Lot. Construction on the house began within the same month. Thereafter, disputes arose concerning work quality and what Jaehne portrayed as frequent and unreasonable demands by the Waldens to remedy minor or imagined defects, change building plans, or obtain "extras" without additional charge. The disputes would escalate to the point that in September 2007, Joy Walden and Jaehne had a verbal altercation in which she ordered him to leave the property permanently and threatened to call the police.

Meanwhile, as construction on the house continued, there was a protracted delay in transferring title to the Lot to the Waldens. Causes of the delay included the fact that the Lot, though purportedly sold by S&J through Jaehne as its agent, was actually owned by Jaehne individually—and Jaehne had fallen behind in his payments of personal debt obligations secured by the property. There was also evidence that Jaehne sought to use the title transfer as leverage to

---

of "President. He wrote all the checks and did all the business." Following that response, Shook was asked, "If he was president, do you have any idea what your position was then?" Shook responded, "Vice-president."

[6] E.g., assisting Jaehne with installing some door hinges, doorknobs, and towel bars.

4

ensure that the Waldens paid amounts he believed they owed for work under the Construction Contract. In response to Jaehne's failure or refusal to transfer title, the Waldens opted to treat the contract as continuing. At some point, Joy Walden drafted and Jaehne signed a document in which he promised to deliver to the Waldens "clear title with a Title Policy, survey and Deed to this property . . . . on or before March 23, 2007." Ultimately, Jaehne and his wife would convey the Lot to the Waldens via a special warranty deed with vendor's lien on December 7, 2007, over a year after the original contemplated closing date.

The Waldens sued S&J and both Jaehne and Shook individually for damages, asserting numerous tort and contract theories.[7] The claims were tried before a jury, which heard evidence for a total of fourteen days. At the conclusion of trial, the district court submitted questions inquiring as to whether S&J, Jaehne, or Shook had committed fraud through either misrepresentation or concealment of material facts; breached fiduciary duties owed to the Waldens; engaged in false, misleading, or deceptive acts or practices prohibited by the DTPA and did so with actual awareness, intent, and knowledge; engaged in unconscionable actions; or breached a warranty. Predicated on affirmative answers as to a defendant's liability for deceptive acts or practices, unconscionable actions, breach of warranty, and fraud by misrepresentation (but not the Waldens' other claims), the court submitted issues on actual damages, as well as questions on additional damages as permitted by the DTPA. Finally, the district court submitted a question inquiring as to whether the harm to the Waldens had resulted from the malice or fraud of each defendant (the predicate facts for awarding

---

[7] The Waldens also sued a second entity owned by Jaehne and Shook, S&J Venture, L.P., and the defendants asserted counterclaims against the Waldens. Each side failed to obtain the jury findings necessary to recover on these claims, however, and they are not at issue on appeal.

5

exemplary damages) and a corresponding question regarding the amount of exemplary damages that should be awarded.

The jury found S&J and Jaehne liable under each of the tort and DTPA theories submitted but awarded zero actual or additional damages. Additionally, although the jury found the predicate facts for imposing exemplary damages against S&J and Jaehne and purported to award approximately $45,000, the predicate finding was not unanimous, as required for such an award. In contrast to its findings against S&J and Jaehne, the jury failed to find that Shook was liable under any of the tort, DTPA, or exemplary-damage questions submitted.

The district court also submitted several liability issues predicated on contractual duties owed to the Waldens by S&J or Jaehne. These included questions inquiring whether S&J or Jaehne had failed to transfer legal title to the lot to the Waldens as required by the Land Contract and the date on which title was finally tendered. The Waldens viewed these questions as material to whether S&J or Jaehne was liable to them for liquidated damages under section 5.079 of the property code. Section 5.079 imposes liquidated damages on "sellers" for delays in transferring title to real property that is sold under an "executory contract" used or to be used as the purchaser's residence. *See* Tex. Prop. Code Ann. §§ 5.062(a), .079 (West 2004). In response to these questions, the jury found that S&J and Jaehne had failed to transfer legal title to the lot to the Waldens as required by the Land Contract and did not tender title until December 7, 2007.

The district court additionally submitted issues inquiring whether S&J was liable to the Waldens for breaching the Construction Contract. The jury found that S&J had breached the

6

Construction Contract, made findings adverse to S&J on defensive issues, and awarded the Waldens $80,000 in benefit-of-the-bargain damages.

The district court did not submit any liability theories predicated on the existence of contractual duties owing directly from Shook to the Waldens. However, the court submitted, in separate questions, three alternative theories that it viewed as predicates for disregarding S&J's separate existence and imposing the entity's contractual liabilities upon either Shook or Jaehne, or both, individually: (1) "alter-ego," (2) "single-business enterprise," and (3) "sham." In response to the first two questions, the jury found, respectively, that S&J was an alter-ego and single-business enterprise of both Shook and Jaehne. In response to the third question, which did not identify or refer to Shook or Jaehne, the jury found that S&J was "operated as a sham."

Based on the foregoing jury findings, the district court rendered judgment awarding the Waldens $80,000 on their claims for breach of the Construction Contract against Jaehne, S&J, and Shook, imposed jointly and severally, plus prejudgment interest on that sum. However, concluding that the Land Contract was not the sort of "executory contract" that was subject to section 5.079 of the property code, the district court refused to award the Waldens liquidated damages.

Having awarded the Waldens damages on a breach-of-contract claim, the district court also awarded them attorney's fees under chapter 38 of the civil practice and remedies code.[8] Specifically, the court held the Waldens were entitled to $318,000 for attorney's fees incurred prior to and during trial, another $10,000 in fees "for the services required to perform post-judgment

---

[8] *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 38.001-.006 (West 2008).

7

discovery and to satisfy the judgment by writ of execution and other procedures," and a total of $25,000 in appellate attorney's fees conditioned only on whether appeals were taken to this Court or the supreme court, regardless of the appeals' outcomes. The district court also awarded the Waldens an additional $10,591.25 "as costs associated with professional services necessitated by actions of Defendants," plus "[c]osts, including but not limited to Jury costs." These awards of fees and costs, like the contract damages, were imposed on S&J, Jaehne, and Shook jointly and severally.

Shook and the Waldens each appealed.[9]

## ANALYSIS

**Shook's appeal**

There is no dispute that, in the absence of affirmative jury findings on any direct liability theories against Shook, the district court's judgment imposing liability against him rests entirely upon the three alternative findings relating to alter-ego, single-business-enterprise, and "sham" theories for disregarding S&J's separate existence—a/k/a "piercing" its "veil"—and imposing the company's obligations under the Construction Contract on him individually. In his

---

[9] Jaehne likewise filed a notice of appeal, but we subsequently dismissed his appeal for want of prosecution. *See Shook v. Walden*, No. 03-09-00576-CV, 2011 Tex. App. LEXIS 1254, at *2 (Tex. App.—Austin Feb. 18, 2011, order) (per curiam). No notice of appeal was ever filed on behalf of S&J. However, both Jaehne and S&J remain parties to the Waldens' cross-appeal, as does Shook, although only Shook has filed a cross-appellee's brief.

During the pendency of his appeal, Shook filed a motion challenging the district court's determination of his supersedeas bond amount, and he and the Waldens extensively litigated several issues of first impression regarding the Legislature's 2003 amendments to chapter 52 of the civil practice and remedies code. *See Shook v. Walden*, 304 S.W.3d 910, 916-31 (Tex. App.—Austin 2010, no pet.). We granted relief in part. *See id.* at 930.

second of three issues on appeal, Shook challenges whether the jury's finding that S&J and he were a single business enterprise can support the judgment. He emphasizes that the Texas Supreme Court has held that the "single-business enterprise" theory is not a valid basis in Texas law for disregarding a business corporation's separate existence and imposing its liabilities on another person. *See SSP Partners v. Gladstrong Invs. (USA) Corp.*, 275 S.W.3d 444, 450-56 (Tex. 2008). The single-business enterprise theory addressed in *SSP Partners* was materially identical to the version submitted to the jury here, and Shook urges that the jury's affirmative finding on that issue thus cannot, as a matter of law, support the judgment against him. The Waldens concede the issue, and we sustain it. In light of *SSP Partners*, the jury's single-business enterprise finding was immaterial and should have been disregarded by the district court.

This leaves the jury's alter-ego and "sham" findings as potential bases for the judgment against Shook, and Shook addresses these in his first issue. Shook asserts that neither of these findings was legally sufficient to support the judgment because the Waldens were required also to prove, and failed to prove, that he had used S&J to perpetrate actual fraud upon the Waldens for his "direct personal benefit" before the district court could validly pierce S&J's veil and impose the entity's contractual obligations on him individually. Shook's argument, as well as the Waldens' responses to it, both reference the historical development of the jurisprudential and statutory standards that have governed application of the veil-piercing remedy to Texas corporations.

Prior to 1989, article 2.21 of the Texas Business Corporation Act mandated that the liability of shareholders in a Texas business corporation was limited to the value of their shares and made no mention of any exception through which they could be held individually liable for the

9

corporation's obligations. *See* Act of May 12, 1989, 71st Leg., R.S., ch. 217, § 1, 1989 Tex. Gen. Laws 974, 974-75. This statutory language notwithstanding, Texas courts, like those of sister states, had long held that a corporation's separate existence could in certain circumstances be disregarded as a matter of equity and its liabilities imposed on shareholders, officers, or directors individually. *See Castleberry v. Branscum*, 721 S.W.2d 270, 271-72 (Tex. 1986); *cf. id.* at 271 (recognizing that "[t]he corporate form normally insulates shareholders, officers, and directors from liability for corporate obligations"). These circumstances included when the corporate form or "fiction" was deemed to have been used as a "sham" to perpetrate "fraud" or to "evade an existing legal obligation," or when the corporation was said to have been organized and operated as a mere "tool" or "business conduit" of another person, i.e., an "alter ego." *Id.* at 271-72 (citing *Pacific Am. Gasoline Co. of Tex. v. Miller*, 76 S.W.2d 833, 851 (Tex. Civ. App.—Amarillo 1934, writ ref'd)); *see id.* at 272 ("[a]lter ego applies when there is such unity between corporation and individual that the separateness of the corporation has ceased and holding only the corporation liable would result in injustice") (citing *First Nat'l Bank in Canyon v. Gamble*, 132 S.W.2d 100, 103 (Tex. 1939)); *Pace Corp. v. Jackson*, 284 S.W.2d 340, 351 (Tex. 1955) (recognizing the "sham to perpetrate fraud" veil-piercing theory).

A seminal event in the evolution of these equitable veil-piercing principles in Texas law—and of the respective roles of the judiciary vis-à-vis the Legislature in regulating their application—was the Texas Supreme Court's 1986 *Castleberry* decision. The immediate issue presented in *Castleberry* concerned the application of the "sham to perpetrate fraud" theory. The supreme court held, in part, that claimants seeking to establish that the corporate form was a

10

"sham to perpetrate fraud" need not prove "actual fraud"—conduct that "usually involves dishonesty of purpose or intent to deceive"—but the broader and more malleable concept of "constructive fraud"—"the breach of some legal or equitable duty which, irrespective of moral guilt, the law declares to be fraudulent because of its tendency to deceive others, to violate confidence, or to injure public interests." *Castleberry*, 721 S.W.2d at 272-73 (quoting *Archer v. Griffith*, 390 S.W.2d 735, 740 (Tex. 1964)); *see id.* at 275 ("[w]hile this evidence may be no evidence of intentional fraud, constructive fraud . . . is the standard"). The court emphasized that "sham to perpetrate fraud" and other corporate veil-piercing doctrines it had previously recognized were rooted in equity, responding to perceived "abuse" of the corporate form or its "use[] as part of a basically unfair device to achieve an inequitable result." *Id.* at 271-72. And it followed, according to the *Castleberry* court, that Texas courts applying veil-piercing principles should employ a "flexible fact-specific approach focusing on equity," relying on "common sense and justice," and eschewing "adherence to any particular theory of liability." *Id.* at 273 (quoting *Gentry v. Credit Plan Corp.*, 528 S.W.2d 571, 575 (Tex. 1975)); Hildebrand, *Texas Corporations* 42 (1942)).

In response to what was perceived as a significant expansion of shareholder and director liability in *Castleberry*, the Legislature in 1989 amended article 2.21 to partially codify and limit judicial application of corporate veil-piercing principles. *See* Act of May 12, 1989, 71st Leg., R.S., ch. 217, § 1, 1989 Tex. Gen. Laws 974, 974-75. These limitations included requiring—in contrast to *Castleberry*'s holding—that a corporate contractual obligation could not be imposed on a shareholder "on the basis of actual or constructive fraud, or a sham to perpetrate a fraud" except on proof that the shareholder had "caused the corporation to be used for the purpose of perpetrating

11

and did perpetrate an actual fraud on the obligee primarily for the direct personal benefit" of the shareholder. Act of May 12, 1989, 71st Leg., R.S., ch. 217, § 1, 1989 Tex. Gen. Laws 974, 974. The Legislature also eliminated shareholder liability for "any contractual obligation on the basis of the failure of the corporation to observe any corporate formality." *See* Act of May 12, 1989, 71st Leg., R.S., ch. 217, § 1, 1989 Tex. Gen. Laws 974, 974-75; *cf. Castleberry*, 721 S.W.2d at 272 (distinguishing alter-ego and "sham to perpetrate fraud" theories and suggesting that the former can be proven by factors "including the degree to which corporate formalities have been followed and corporate and individual property have been kept separately").

Subsequent amendments to article 2.21 extended the requirement of proving "actual fraud" for the defendant's "direct personal benefit" to veil piercing "on the basis that the holder . . . *is or was the alter ego of the corporation*, or on the basis of actual fraud or constructive fraud, a sham to perpetrate a fraud, *or other similar theory*," Act of May 7, 1993, 73d Leg., R.S., ch. 215, § 2.05, 1993 Tex. Gen. Laws 418, 446 (emphases added), and expanded the range of underlying liability claims covered by the statute to include not only those based on contractual obligations, but also "any matter relating to or arising from the obligation," Act of May 13, 1997, 75th Leg., R.S., ch. 375, § 7, 1997 Tex. Gen. Laws 1516, 1522-23. The Legislature further emphasized that liability of a shareholder for contractual obligations or related matters under article 2.21 "is exclusive and preempts any other liability imposed . . . under common law or otherwise." Act of May 7, 1993, 73d Leg., R.S., ch. 215, § 2.05, 1993 Tex. Gen. Laws 418, 446. Article 2.21, as amended, was later recodified without material substantive change as sections 21.223 and 21.224 of the business organizations code. *See* Act of May 26, 2003, 78th Leg., R.S., ch. 182, § 1, 2003 Tex. Gen. Laws

267, 427 (amended 2007) (current version at Tex. Bus. Orgs. Code Ann. §§ 21.223, .224 (West Pamph. 2011); *see also Willis v. Donnelly*, 199 S.W.3d 262, 272 (Tex. 2006) (applying sections 21.223 and 21.224).

Meanwhile, as these jurisprudential and statutory standards governing veil piercing of corporations were continuing to evolve, the Texas Legislature, for the first time, authorized the creation of limited liability companies through its 1991 enactment of the Texas Limited Liability Company Act (LLC Act),[10] later recodified as title 3 of the business organizations code.[11] There is no dispute that S&J was formed under the former LLC Act and that its actions at issue here are governed by that statute rather than the code,[12] although neither side suggests that there were any material substantive differences between the relevant counterpart provisions as of time of trial. Pertinent to this appeal, former LLC Act article 4.03 specified that "[e]xcept as and to the extent the regulations [of the LLC] specifically provide otherwise, a member or manager is not liable for the debts, obligations or liabilities of a limited liability company including under a judgment decree, or order of a court." Act of May 25, 1991, 72d Leg., R.S., ch. 901, § 42, art. 4.03, 1991 Tex. Gen. Laws 3203 (amended 2003) (current version at Tex. Bus. Orgs. Code Ann. § 101.114 (West Pamph.

---

[10] Act of May 25, 1991, 72d Leg., R.S., ch. 901, § 42, 1991 Tex. Gen. Laws 3161, 3192-236 (amended 2003, 2007, 2009, 2011) (current version at Tex. Bus. Orgs. Code Ann. §§ 101.001-.621 (West. Pamph. 2011)). LLCs are a comparatively recent innovation in business organizational form, in essence affording the corporation-like benefit of limited liability but with partnership tax treatment. *See Austen v. Catterton Partners V, LP*, 729 F. Supp. 2d 548, 554 (D. Conn. 2010). Wyoming was the first state to authorize the creation of LLCs, in 1977. *See id.*; Wyo. Stat. Ann. §§ 17-15-101 to -136 (West 1977) (repealed 2010).

[11] Act of May 26, 2003, 78th Leg., R.S., ch. 182, § 1, 2003 Tex. Gen. Laws 267, 495-509 (amended 2007, 2009) (current version at Tex. Bus. Orgs. Code Ann. §§ 101.001-.621).

[12] *See* Tex. Bus. Orgs. Code Ann. §§ 402.001, .003, .005-.006, .014 (West Pamph. 2011).

2011)).  It further provided that a member of a limited liability company is not a proper party to proceedings by or against the company, except where the object is to enforce a member's right against or liability to the company.  Act of May 25, 1991, 72d Leg., R.S., ch. 901, § 42, art. 4.03, 1991 Tex. Gen. Laws 3203 (amended 2003) (current version at Tex. Bus. Orgs. Code Ann. § 101.113 (West Pamph. 2011)).

Former LLC Act article 4.03 and its successors made no mention of veil-piercing principles as an exception to limited liability or whether or how such remedies might be applied against LLCs.  Eventually, in 2011, the Legislature would add a new section 101.002 to title 3 of the business organizations code specifying that the code sections regulating and restricting veil piercing of corporations, sections 21.223 and 21.224, also apply to LLCs, their members, and their managers.[13]  However, as Shook acknowledges, this amendment came too late to impact the result in this case, which continues to be governed by the prior law.[14]

As had been the case with the pre-1989 version of article 2.21 of the Texas Business Corporation Act, which had similarly mandated limited liability while being silent as to veil piercing, Texas courts applying the pre-2011 versions of the LLC statutes have uniformly held (or at least assumed) that an LLC's veil could be pierced under extra-statutory equitable principles, although the Texas Supreme Court has yet to definitively address that question.[15]  In any event, Shook has not

---

[13]  Act of Apr. 20, 2011, 82d Leg., R.S., ch. 25, § 1, 2011 Tex. Gen. Laws 45, 45.

[14]  Act of Apr. 20, 2011, 82d Leg., R.S., ch. 25, § 2, 2011 Tex. Gen. Laws 45, 45 ("This Act takes effect September 1, 2011").

[15]  *See, e.g.*, *McCarthy v. Wani Venture, A.S.*, 251 S.W.3d 573, 590-91 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) (rejecting argument that article 4.03 of LLC Act absolutely shielded its members from liability, observing that courts in Texas and other jurisdictions "have applied

disputed that, as a general proposition, the veil of an LLC, like that of a corporation, may be pierced in some circumstances.  But it follows, in Shook's view, that the same standards, restrictions, and limitations govern the availability and application of the veil-piercing remedy against both types of entities.  These standards, Shook urges, include those stated in former Business Corporations Act article 2.21 and business organizations code section 21.223—before a trial court can impose on an individual "any contractual obligation" of the entity "or any matter relating to or arising from the obligation" on the basis that the individual is or was the entity's "alter ego . . . or on the basis of actual fraud or constructive fraud, a sham to perpetrate a fraud, or other similar theory," the claimant must prove that the individual caused the entity to be "used for the purpose of perpetrating and did perpetrate an actual fraud" on the claimant primarily for the individual's "direct personal benefit." Act of May 12, 1989, 71st Leg., R.S., ch. 216, § 1, 1989 Tex. Gen. Laws 974, 974-75 (amended 1993, 1997, 2003, 2007) (current version at Tex. Bus. Orgs. Code Ann. § 21.223).

Applying these standards to this case, Shook observes that the district court's judgment holds him liable for what is plainly a "contractual obligation" of S&J "or [a] matter relating to or arising from the obligation" (S&J's obligations under the Construction Contract) and purports to impose that liability via "alter ego" and "sham" theories that come within "alter ego . . .

---

to LLCs the same state law principles for piercing the corporate veil that they have applied to corporations" and finding no judicial support to the contrary) (citing *Pinebrook Props., Ltd. v. Brookhaven Lake Prop. Owners Ass'n*, 77 S.W.3d 487, 499 (Tex. App.—Texarkana 2002, pet. denied); *Kaycee Land & Livestock v. Flahive*, 46 P.3d. 323, 327 (Wyo. 2002); *In re Securities Inv. Prot. Corp. v. R.D. Kushnir & Co.*, 274 B.R. 768, 775-76 (Bankr. N.D. Ill. 2002); *Hamilton v. AAI Ventures, L.L.C.*, 768 So. 2d 298, 302 (La. App. 2000)); *Pinebrook Props., Ltd.*, 77 S.W.3d at 499 (applying veil-piercing theories to LLC without elaborating as to why they applied). *See also* authorities cited in notes 18-19, *infra*.

or on the basis of actual fraud or constructive fraud, a sham to perpetrate a fraud, or other similar theory." Act of May 12, 1989, 71st Leg., R.S., ch. 216, § 1, 1989 Tex. Gen. Laws 974, 974-75 (amended 1993, 1997, 2003, 2007).[16] Consequently, Shook urges, the Waldens were required to prove that he had caused S&J to be "used for the purpose of perpetrating and did perpetrate an actual fraud" on the Waldens primarily for his "direct personal benefit" as a predicate for the judgment the district court rendered against him. *See id*.

The Waldens could have met such a burden either by presenting conclusive evidence that Shook had caused S&J to be "used for the purpose of perpetrating and did perpetrate an actual fraud" on the Waldens primarily for Shook's "direct personal benefit" or by obtaining a jury finding of such facts. *See, e.g.*, *Hanson Aggregates West, Inc. v. Ford*, 338 S.W.3d 39, 42-46 (Tex. App.—Austin 2011, pet. denied) (discussing alternative requirements of affirmative

---

[16] The jury found that S&J was the "alter-ego" of both Jaehne and Shook "in connection with either or both the 'Land Contract' and the 'Construction Contract.'" The jury was instructed that "a corporation is the alter ego of a shareholder when there is such unity between the corporation and the shareholder that the separateness of the corporation has ceased, or when a corporation operates as a mere tool or business conduit of its shareholder," as "shown from the total dealings" of the two. The jury was further instructed to consider: (1) "the degree to which . . . the property of the corporation and that of the shareholder have been kept separate"; (2) "the amount of financial interest, ownership, and control the shareholder maintains over the corporation"; (3) "whether the corporation has been used for personal purposes"; (4) "the payment of alleged corporate debts with personal checks or other commingling of funds"; (5) "representations that the individual will financially back the corporation"; (6) "the diversion of company profits to the individual for his or her personal use"; (7)"inadequate capitalization"; and (8) "failure to keep corporate and personal assets separate."

As for the "sham" theory, the jury found in the affirmative as to, "Was [S&J] operated as a sham?" The district court instructed the jury that a "sham" includes: (1) "[s]iphoning off corporate assets to circumvent corporate debts"; and (2) "[s]tarting a new company which is a continuance of the old company." The jury was not asked to find who—Shook or Jaehne—operated S&J as a "sham," nor was the question predicated on the jury's findings in response to any other questions.

16

jury findings or conclusive evidence).  Shook questions whether there was any evidence, much less conclusive evidence, that he had used S&J to perpetrate an actual fraud on the Waldens primarily for his "direct personal benefit."  As for a jury finding, Shook observes that neither the district court's alter-ego question nor its "sham" question explicitly submitted the issues of whether he had used S&J to perpetrate an actual fraud for his "direct personal benefit."[17]  Instead, Shook asserts, the issues were subsumed within one or more of the questions inquiring whether he was liable for fraud.  *See Willis*, 199 S.W.3d at 272 (addressing similar separate submission of fraud in case applying business organizations code sections 21.223 and 21.224).  In response to each of these questions, the jury, as previously noted, failed to find that Shook had committed fraud.  *See id.* (holding that jury's failure to find defendant's fraud in separately submitted question precluded corporate veil from being pierced).  In the absence of the requisite findings or conclusive evidence that Shook had used S&J to perpetrate actual fraud for his own direct personal benefit, Shook concludes, the district court erred in disregarding S&J's separate existence and holding him individually liable.

In response, the Waldens join issue principally with Shook's premise that the availability and application of the veil-piercing remedy against S&J, an LLC, was governed by the same standards, restrictions, and limitations applicable to corporations.  That premise, in the Waldens' view, is refuted by a straightforward comparison of the statutes that govern corporations vis-à-vis LLCs.  They emphasize that the requirements Shook seeks to impose originated in former Business Corporations Act article 2.21, which speaks solely to "corporations" and "shareholders":

---

[17] *See supra* note 16.

17

A.  A *holder of shares, an owner of any beneficial interest in shares, or a subscriber for shares* whose subscription has been accepted, or any affiliate thereof or of the *corporation*, shall be under no obligation to the *corporation* or to its obligees with respect to:

. . .

(2)  any contractual obligation *of the corporation* or any matter relating to or arising from the obligation on the basis that the holder, owner, subscriber, or affiliate is or was the alter ego *of the corporation*, or on the basis of actual fraud or constructive fraud, a sham to perpetrate a fraud, or other similar theory, unless the obligee demonstrates that the holder, owner, subscriber, or affiliate caused *the corporation* to be used for the purpose of perpetrating and did perpetrate an actual fraud on the obligee primarily for the direct personal benefit of the holder, owner, subscriber, or affiliate; or

. . .

B.  The liability of *a holder, owner, or subscriber of shares of a corporation* or any affiliate thereof *or of the corporation* for an obligation that is limited by Section A of this article is exclusive and preempts any other liability imposed on a holder, owner, or subscriber of shares of a corporation or any affiliate thereof or of the corporation for that obligation under common law or otherwise . . . .

Act of May 12, 1989, 71st Leg., R.S., ch. 216, § 1, 1989 Tex. Gen. Laws 974, 974-75 (amended 1993, 1997, 2003, 2007) (emphases added).  And this focus exclusively on corporations and shareholders, the Waldens further observe, was carried over into business organizations code sections 21.223 and 21.224.  *See* Act of May 26, 2003, 78th Leg., R.S., ch. 182, § 1, 2003 Tex. Gen. Laws 267, 427 (amended 2007) (current version at Tex. Bus. Orgs. Code Ann. §§ 21.223, .224).

The Waldens contrast the foregoing provisions governing "corporations" and "shareholders" with the statutes governing LLCs, an entirely distinct organizational form comprised of "members."  *See* Act of May 25, 1991, 72d Leg., R.S., ch. 901, § 42, 1991 Tex. Gen. Laws 3161,

18

3192-236 (amended 2003, 2007, 2009, 2011) (current version at Tex. Bus. Orgs. Code Ann. §§ 101.001-.621 (West. Pamph. 2011)). And, while obviously being cognizant of key differences between corporations and LLCs, the Legislature, the Waldens urge, conspicuously omitted from the LLC statutes (at least until 2011) the sorts of restrictions it had applied to the veil-piercing of corporations. This omission, especially when contrasted with the inclusion of such restrictions in the statutes governing corporations, the Waldens conclude, evidences legislative intent that those restrictions *not* apply when the veil-piercing remedy is applied against LLCs. *See Railroad Comm'n of Tex. v. Texas Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 628 (Tex. 2011) ("When the Legislature uses a word or phrase in one portion of a statute but excludes it from another, the term should not be implied where it has been excluded."); *Texas Lottery Comm'n v. First State Bank of DeQueen*, 325 S.W.3d 628, 635 (Tex. 2010) ("We presume the Legislature selected language in a statute with care and that every word or phrase was used with a purpose in mind.").

In the absence of any statutes regulating veil-piercing of LLCs, the Waldens further reason, the standards that govern application of that remedy against S&J in essence defaulted to the state of Texas law as it existed prior to the Legislature's 1989 enactment of former Business Corporation Act article 2.21—i.e., it is governed by equitable principles, as described and applied in *Castleberry*. *See Castleberry*, 721 S.W.2d at 271-73. In *Castleberry*, as previously noted, the Texas Supreme Court held that the "fraud" required to establish that a corporation had been used as a "sham to perpetrate fraud" was merely "constructive fraud"—"the breach of some legal or equitable duty which, irrespective of moral guilt, the law declares to be fraudulent because of its tendency to deceive others, to violate confidence, or to injure public interests"—rather than actual

19

fraud. *Id.* at 272-73, 275. And whether Shook had committed that sort of "fraud," the Waldens suggest, was submitted to the jury in the "sham" question. By obtaining an affirmative finding on that issue, the Waldens insist, they met their burden of proving that S&J was a sham to perpetrate a fraud. They add that in the absence of a statutory requirement that they prove actual fraud for Shook's direct personal benefit, the jury's alter-ego finding can also independently support the judgment. Accordingly, the Waldens urge, the district court did not err in relying on either finding as a basis for its judgment against Shook.

The case law to date provides only limited guidance in resolving the parties' dispute. The Texas Supreme Court has not yet definitively spoken regarding whether or how corporate veil-piercing principles apply to LLCs. Shook does refer us to several cases from our sister courts and Texas federal courts that, in his view, support a holding that proof of actual fraud and direct personal benefit is required to pierce an LLC's veil. Many of these decisions trace back to two of the cases he cites, *Pinebrook Properties, Ltd. v. Brookhaven Lake Property Owners Association*, 77 S.W.3d 487 (Tex. App.—Texarkana 2002, pet. denied), and *McCarthy v. Wani Venture, A.S.*, 251 S.W.3d 573 (Tex. App.—Houston [1st Dist.] 2007, pet. denied).

In *Pinebrook Properties*, the court of appeals reversed a district court judgment that had pierced the veil of an LLC via an alter-ego theory, holding that the evidence was legally insufficient to support a finding of alter ego. 77 S.W.3d at 500-01. In relevant part, the court, citing article 2.21 of the former Business Corporation Act, held that proof of "[f]ailure to comply with corporate formalities is no longer considered in determining alter ego and is therefore no evidence of alter ego." *Id.* The court's reliance on this feature of former article 2.21 would imply that the

20

requirement that claimants prove actual fraud and direct personal benefit, found in the same statute, likewise extends to LLCs, as Shook urges here. However, even while acknowledging that article 2.21 referred to "corporate" matters, the court did not elaborate on its reasoning in applying the statute to an LLC. *See id.* Nor does there appear to be any indication in the opinion that the issue was disputed. *See id.*

In *McCarthy*, the trial court had submitted an actual fraud/direct personal benefit question in an LLC veil-piercing case, the jury had found in the affirmative, and the applicability of that requirement was not specifically disputed on appeal. *See* 251 S.W.3d at 589-92; *see also id.* at 592-95 (Jennings, J., dissenting). Instead, the claimant challenged whether an LLC's veil could be pierced in the first place, emphasizing former LLC Act article 4.03's mandate of limited liability and its silence regarding veil piercing. *See* 251 S.W.3d at 590. In rejecting that argument, the court of appeals, citing *Pinebrook Properties* and several decisions under other states' LLC statutes, reasoned that "Texas courts and other jurisdictions[] have applied to LLCs the same state-law principles for piercing the corporate veil that they have applied to corporations." *Id.* at 590-91 (citing *Pinebrook Props., Ltd.*, 77 S.W.3d at 499; *Kaycee Land & Livestock v. Flahive*, 46 P.3d. 323, 327 (Wyo. 2002); *In re Securities Inv. Prot. Corp. v. R.D. Kushnir & Co.*, 274 B.R. 768, 775-76 (Bankr. N.D. Ill. 2002); *Hamilton v. AAI Ventures, L.L.C.*, 768 So. 2d 298, 302 (La. App. 2000)). It added that the appellant "has not offered, nor can we find, any judicial support for the proposition that existing state law doctrines of piercing the corporate veil should not be applied to LLCs." *Id.* at 591. Although potentially having broader implications for this case, the court's statement, again, was made in the context of deciding only that an LLC's veil could be pierced, not whether LLC veil piercing is governed by precisely the same standards and limitations as corporation veil piercing.

21

The subsequent decisions of our sister courts on which Shook relies have similarly applied corporate veil-piercing standards to LLCs without analysis (other than an occasional citation to *Pinebrook Properties*, *McCarthy*, or their other progeny) and in circumstances where the applicability of those standards was not in dispute.[18] The same is true of federal decisions that Shook

**[18]** *See Penhollow Custom Homes, LLC v. Kim*, 320 S.W.3d 366, 372-74 (Tex. App.—El Paso 2010, no pet.) (jury charge on alter-ego theory against LLC had submitted actual fraud/direct personal benefit issue, and court of appeals ultimately reversed based on legally sufficient evidence of the unity required for alter ego; no dispute or analysis regarding applicability of the actual fraud/direct personal benefit requirement); *Sanchez v. Mulvaney*, 274 S.W.3d 708, 712 (Tex. App.—San Antonio 2008, no pet.) (citing *McCarthy* for proposition that "state law principles for piercing the corporate veil apply" to LLCs and affirming summary judgment for defendant predicated on absence of evidence of actual fraud; no analysis or apparent dispute regarding the applicability of that requirement to LLC); *Solutioneers Consulting, Ltd. v. Gulf Greyhound Partners, Ltd.*, 237 S.W.3d 379, 387-89 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (reversing judgment piercing LLC's veil via alter-ego theory based on no evidence that individual defendant obtained a "direct personal benefit"; jury charge had tracked the language of former article 2.21 and no party had objected to it); *Morris v. Powell*, 150 S.W.3d 212 (Tex. App.—San Antonio 2004, no pet.) (similar to *Pinebrook Properties*, relying on former article 2.21 for proposition that failure to comply with corporate formalities "is no longer a factor in considering whether alter ego exists" and ultimately holding that there was legally insufficient evidence of alter ego; no elaboration regarding court's reasoning); *see also Phillips v. B.R. Brick and Masonry, Inc.*, No. 01-09-00311-CV, 2010 Tex. App. LEXIS 7531, at *19-29 & n.6 (Tex. App.—Houston [1st Dist.] Sept. 10, 2010, no pet.) (mem. op.) (applying *Castleberry* veil-piercing standards where no objection was preserved to jury charge submitting those theories to the jury, and further noting that neither party had raised the possible applicability of former article 2.21). Still other decisions cited by Shook merely state the general concept that veil-piercing principles can be applied to LLCs. *See Roustan v. Sanderson*, No. 02-09-00377-CV, 2011 Tex. App. LEXIS 7827 at *8-9 & n.6 (Tex. App.—Fort Worth Dec. 1, 2011, no pet.) (mem. op.) (citing *McCarthy* for general proposition that "Texas courts have applied to limited liability corporations the same state law principles for piercing the corporate veil that they have applied to corporations"); *Gonzalez v. Lehtinen*, No. 13-06-00441-CV, 2008 Tex. App. LEXIS 1889, at *14 n.6 (Tex. App.—Corpus Christi Mar. 13, 2008, pet. denied) (mem. op.) (in context of jurisdictional veil-piercing analysis, citing *Pinebrook Properties* and *McCarthy* for general proposition that "[t]he applicability of alter ego doctrine is not limited to business entities which are registered as corporations; it is also possible to 'pierce the corporate veil' of a limited liability company").

cites.[19] As Shook ultimately acknowledges, none of these decisions squarely addresses a disputed issue regarding whether or how the statutory corporate veil-piercing requirements apply to LLCs. At best, these cases can be said merely to be consistent with an implicit conclusion that those same requirements apply.

In contrast to the decisions on which Shook relies, our independent research has uncovered an out-of-state federal-court decision that squarely addresses whether proof of actual fraud and direct personal benefit is required to pierce the veil of a Texas LLC. *See Taurus IP, LLC v. DaimlerChrysler Corp.*, 534 F. Supp. 2d 849 (W.D. Wis. 2008) (Texas law). Relying on a statutory construction analysis similar to that advanced by the Waldens here, the court reasoned that proof of actual fraud was not required to pierce an LLC's veil because former article 2.21 of the Business Corporation Act "limits alter ego liability only for shareholders, owners, subscribers and affiliates, not directors, officers, managers or members." *Id.* at 871. The court further reasoned, as do the Waldens, that application of the veil-piercing remedy was governed by *Castleberry*, and "a showing that an action was 'so grossly unfair as to constitute constructive fraud' will suffice." *Id.* at 871-72 (quoting *Castleberry*, 721 S.W.2d at 273).[20]

---

[19] *See Prospect Energy Corp. v. Dallas Gas Partners, LP*, 761 F. Supp. 2d 579, 593 n.11 (S.D. Tex. 2011) (Texas law); *Adams Offshore Ltd. v. Osa Int'l, LLC*, No. H-09-0465, 2011 U.S. Dist. LEXIS 113538, at *25 (S.D. Tex. Sept. 30, 2011) (Texas law); *Interplan Architects, Inc. v. C.L. Thomas, Inc.*, No. 4:08-cv-03181, 2010 U.S. Dist. LEXIS 114306, at *160 (S.D. Tex. Oct. 27, 2010); *In re JNS Aviation, LLC*, 395 Fed. Appx. 127 (5th Cir. 2010) (Texas law).

[20] As an incidental matter of historical fact, anecdotal legislative history reflects that the 2011 amendments to the LLC statutes responded in part to perceived "confusion" generated by the *Taurus* decision. *See* Senate Comm. on Bus. & Commerce, Bill Analysis, Tex. S.B. 323, 82d Leg., R.S. (2011).

23

To the extent that Shook's position relies solely on the texts of the veil-piercing restrictions and limitations in former Business Corporation Act article 2.21 and its successors, we would agree with the Waldens and the *Taurus* court that these requirements did not, as a matter of statutory construction, extend to LLCs at any time relevant to this case. *See Texas Citizens for a Safe Future & Clean Water*, 336 S.W.3d at 628; *Laidlaw Waste Sys. (Dallas), Inc. v. City of Wilmer*, 904 S.W.2d 656, 659 (Tex. 1995) ("every word excluded from a statute must also be presumed to have been excluded for a purpose" (internal quotes omitted)). And absent an applicable statute, as the Waldens urge, the availability of the veil-piercing remedy would be governed by extra-statutory equitable principles. However, it does not automatically follow that proper application of those equitable principles to S&J must track *Castleberry*, as the Waldens presume.

The application of veil-piercing principles, in *Castleberry* or elsewhere, reflects a balancing of competing policy interests concerning what are ultimately matters of economic regulation. On one hand are the goals said to be advanced by the State's provision of limited liability, such as encouraging investment, entrepreneurship, and economic growth. *See, e.g.*, *Willis*, 199 S.W.3d at 272 ("Avoidance of personal liability is not only sanctioned by the law; it is an essential reason that entrepreneurs like Willis choose to incorporate their businesses."). On the other hand is the goal of preventing limited liability and the entity's separate existence from being used to achieve ends that the law disfavors, expressed in terms of "abuse," "injustice," or "inequity." *See id.* at 271-72; *see also SSP Partners (USA) Corp.*, 275 S.W.3d at 455 (more recently explaining that "By 'injustice' and 'inequity' we do not mean a subjective perception of unfairness by an individual judge or juror; rather, these words are used in *Castleberry* as shorthand references for the

24

kinds of abuse, specifically identified, that the corporate structure should not shield."). How these competing considerations are weighed determines both the nature of "abuse" that is said to warrant veil piercing and how such "abuse" is proven.

At the time the Texas Supreme Court decided *Castleberry*, in 1986, the Legislature had not yet expressed its views through statute regarding the appropriate balancing of these interests. Within a few years thereafter, the Legislature spoke through the 1989 amendments to former Business Corporation Act article 2.21, and again through subsequent amendments. In so doing, the Legislature struck a balance that differed markedly from that of the *Castleberry* court with respect to veil piercing to impose individual liability for corporate contractual obligations—a claimant must prove that the individual used the corporate form to perpetrate actual fraud (i.e., that characterized by deliberately misleading conduct) for the individual's direct personal benefit. This balancing in part reflects a distinction, also reflected in pre-*Castleberry* cases, between the perceived relative equities of veil-piercing claimants who are asserting tort theories of recovery versus those suing in contract. The basic notion was that contract claimants, unlike most third parties suing in tort, had voluntarily chosen to deal with the corporation and, "[a]bsent some deception or fraud," would have had the opportunity to apportion, through negotiated contract terms, the risk that the entity would be unable to meet its obligations. *See Lucas v. Texas Indus., Inc.*, 696 S.W.2d 372, 375 (Tex. 1984).

We believe that these legislative policy judgments and balancing of interests must necessarily inform judicial application to LLCs of the equitable veil-piercing principles contemplated in *Castleberry*. In so concluding, we follow the lead of the Texas Supreme Court in addressing analogous issues concerning equitable prejudgment interest. After the supreme court held in its

25

*Cavnar* decision that equitable prejudgment interest must be awarded in tort cases and prescribed accrual and compounding methodologies,[21] the Legislature responded with a statute that prescribed somewhat less generous calculation methods but made them applicable only in cases involving "wrongful death, personal injury, and property damage," leaving other cases to be governed by equitable principles.[22] Thereafter, in *Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc.*, the supreme court, in deference to the Legislative policy judgments reflected in the prejudgment interest statute, overruled *Cavnar* to the extent of conforming the preexisting equitable accrual and compounding methodologies to the statutory standards even in cases that the statute did not reach. *See Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 530-31 (Tex. 1998); *see also Owens-Illinois, Inc. v. Estate of Burt*, 897 S.W.2d 765, 769 (Tex. 1995) (adopting a prejudgment interest accrual rule for latent-injury cases "consistent with the prejudgment interest statute"). Such deference is especially appropriate when, as here, we are addressing matters of economic regulation, an arena in which the Legislature possesses institutional competence superior to that of the judiciary—and, lest we overlook, we are applying an extra-statutory equitable remedy that not only was not mentioned in the LLC statutes at relevant times, but was also inconsistent with the statutes' explicit mandate of limited liability.

Although the Waldens emphasize that the Legislature did not enact a statute to govern veil piercing of LLCs at times relevant to this case, they offer no reason why the relative equities

---

[21] *See generally Cavnar v. Quality Control Parking, Inc.*, 696 S.W.2d 549, 554-55 (Tex. 1985).

[22] *See Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 530 (Tex. 1998).

present when claimants assert contract claims against LLCs and seek to pierce the entity's veil would categorically differ from those present when such claimants sue corporations. Nor can we perceive any; in either case, the basic question is the same: when should the policies of shielding investors and entrepreneurs from liability yield to the goal of preventing "abuse" of the entity's separate existence? As between the framework with which *Castleberry* resolved that question and the one more recently prescribed by the Legislature for veil-piercing claims against corporations, we believe that Texas courts must be guided by the latter in determining equity with respect to veil-piercing claims against LLCs. That is to say, claimants seeking to pierce the veil of an LLC must meet the same requirements as they would if the entity were a corporation. We would also observe that our conclusion is consistent with the results in Texas cases like *Pinebrook Properties*, although it is admittedly not made explicit in the reasoning of those decisions.[23]

---

[23] Nor is a contrary conclusion suggested by the fact that the Legislature later saw fit to amend the LLC statute to explicitly incorporate the veil-piercing standard prescribed in the corporation statutes. While it is true that we are generally to presume that statutory language is not superfluous or redundant, *see City of San Antonio v. City of Boerne*, 111 S.W.3d 22, 29 (Tex. 2003) ("It is an elementary rule of construction that, when possible to do so, effect must be given to every sentence, clause, and word of a statute so that no part thereof be rendered superfluous."); *but cf. In re Nash*, 220 S.W.3d 914, 917-18 (Tex. 2007) (noting that "there are times when redundancies are precisely what the Legislature intended"), the 2011 amendment had legal effect beyond mandating what we have concluded were the same veil-piercing standards already required as a matter of equity—the amendment asserted legislative control over the application of veil-piercing principles in a category of cases in which such issues had previously been controlled solely by equitable principles administered by the judiciary. In any event, legislative perceptions as to the then-existing state of the law do not control our determination of what that law actually is. *See, e.g.*, *Pruett v. Harris Cnty. Bail Bond Bd.*, 249 S.W.3d 447, 454 (Tex. 2008) ("we . . . give little weight to . . . subsequent enactments in interpreting the prior law") (quoting *Ervin v. State*, 991 S.W.2d 804, 816 (Tex. Crim. App. 1999)).

Deferring to the legislative standards governing veil piercing of corporations and applying them to the Waldens' claims here, it is beyond dispute that the district court's judgment holds Shook liable for a "contractual obligation" of S&J "or [a] matter relating to or arising from the obligation" and purports to impose that liability via "alter ego . . . or on the basis of actual fraud or constructive fraud, a sham to perpetrate a fraud, or other similar theory." *See* Act of May 12, 1989, 71st Leg., R.S., ch. 216, § 1, 1989 Tex. Gen. Laws 974, 974-75 (amended 1993, 1997, 2003, 2007). Consequently, the judgment against Shook must rest on proof that Shook caused S&J to be "used for the purpose of perpetrating and did perpetrate an actual fraud" on the Waldens primarily for his "direct personal benefit." *See id.* The Waldens do not appear to dispute Shook's assertions that they did not meet this burden through either conclusive evidence or jury findings. To the extent they do, we agree with Shook that the Waldens did not present legally or factually sufficient evidence that Shook either used S&J to perpetrate an actual fraud (i.e., that involving "dishonesty of purpose or intent to deceive," *Castleberry*, 721 S.W.2d at 273), or that he did so for his "direct personal benefit," *Solutioneers Consulting, Ltd. v. Gulf Greyhound Partners, Ltd.*, 237 S.W.3d 379, 388 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (concluding that there was insufficient evidence to hold defendant personally liable because, even though defendant committed fraud, there was no evidence regarding his direct personal benefit therefrom). The Waldens emphasize that Shook was the primary investor in S&J; that he was one of only two members of the LLC; that he signed some checks on S&J's behalf and that on two occasions, he gave money that he withdrew from the company to his daughter; that he visited the work site roughly five times; and that he used his residence as the LLC's mailing address. While perhaps relevant to the elements of alter-ego or even

28

"sham" as these theories were submitted to the jury, none of this evidence, without more, raises a reasonable inference to support the required additional findings that Shook used S&J to perpetrate an actual fraud and did so for his direct, personal benefit.

Absent proof that Shook caused S&J to be used to perpetrate actual fraud for his direct, personal benefit, we must hold that the district court erred in rendering judgment imposing liability against Shook. We sustain Shook's first issue. The foregoing holdings render it unnecessary for us to reach an alternative legal-sufficiency challenge Shook asserts against the jury's alter-ego finding. *See* Tex. R. App. P. 47.1.[24]

Finally, in his third and remaining issue, Shook urges that the district court abused its discretion in awarding the Waldens sums for "professional services" expenses, post-judgment attorney's fees, appellate attorney's fees that are not conditioned on the Waldens' success, and "costs" that included jury fees. Having sustained Shook's first two issues and held that the district court erred in imposing liability on him in the first place, we need not reach these complaints with the specific amounts the court awarded against him. *See id.*

**The Waldens' appeal**

The Waldens bring three issues in their cross-appeal urging that the district court

---

[24] Similarly, we dismiss as moot a post-submission "Motion to Supplement the Clerk's Record or, in the Alternative, Motion to Take Judicial Notice" in which the Waldens seek to emphasize documents and information concerning S&J's financial condition. The gravamen of the Waldens' filing and related arguments is that they are unlikely to recover the judgment amount from S&J and that we should consider that fact in evaluating whether "equity" supports application of the veil-piercing remedy here. Leaving aside the relevance of this information and whether it could be properly presented on appeal, it would not remedy the fatal absence of the required findings that Shook used S&J to perpetrate actual fraud for his direct personal benefit.

erred in refusing to award them liquidated damages against each cross-appellee under section 5.079 of the property code. Specifically, in their first issue, the Waldens argue that the district court erred in its legal conclusion that the Land Contract was not the sort of "executory contract" that was subject to section 5.079. In their second issue, the Waldens urge that in light of the jury's findings regarding the Land Contract and the date title passed, the district court was compelled to render judgment against S&J awarding them $192,000 in liquidated damages under section 5.079, plus interest, and that we should reverse the district court and render that judgment. Finally, in their third issue, the Waldens assert that the jury's veil-piercing findings require imposition of that liability against both Shook and Jaehne individually.

As a threshold matter, we observe that the imposition of such liability against Shook would require the same findings of actual fraud and direct personal benefit as with S&J's Construction Contract liabilities because the liability would "relate to" or "arise from" a "contractual obligation" of the LLC, namely S&J's obligations under the Land Contract. Consequently, we overrule the Waldens' issues as to Shook for the same reasons we have sustained Shook's issues on appeal.

However, we must still address whether the Waldens are entitled to section 5.079 liquidated damages against S&J or Jaehne. Resolution of that issue, unlike Shook's appellate issues, turns purely on statutory construction, which presents a question of law that we review de novo. *See State v. Shumake*, 199 S.W.3d 279, 284 (Tex. 2006). When construing a statute, our primary objective is to give effect to the Legislature's intent. *Id.* We seek that intent "first and foremost" in the statutory text. *Lexington Ins. Co. v. Strayhorn*, 209 S.W.3d 83, 85 (Tex. 2006). "Where text

30

is clear, text is determinative of that intent." *Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 437 (Tex. 2009) (op. on reh'g) (citing *Shumake*, 199 S.W.3d at 284; *Alex Sheshunoff Mgmt. Servs. L.P. v. Johnson*, 209 S.W.3d 644, 651-52 (Tex. 2006)). We consider the words in context, not in isolation. *State v. Gonzalez*, 82 S.W.3d 322, 327 (Tex. 2002). We rely on the plain meaning of the text, unless a different meaning is supplied by legislative definition or is apparent from context, or unless such a construction leads to absurd results. *See City of Rockwall v. Hughes*, 246 S.W.3d 621, 625-26 (Tex. 2008) (citing *Texas Dep't of Transp. v. City of Sunset Valley*, 146 S.W.3d 637, 642 (Tex. 2004)); *see also* Tex. Gov't Code Ann. § 311.011 (West 2005) ("Words and phrases shall be read in context and construed according to the rules of grammar and common usage," but "[w]ords and phrases that have acquired a technical or particular meaning, whether by legislative definition or otherwise, shall be construed accordingly."). We also presume that the Legislature was aware of the background law and acted with reference to it. *See Acker v. Texas Water Comm'n*, 790 S.W.2d 299, 301 (Tex. 1990). We further presume that the Legislature selected statutory words, phrases, and expressions deliberately and purposefully. *See DeQueen*, 325 S.W.3d at 635; *Shook v. Walden*, 304 S.W.3d 910, 917 (Tex. App.—Austin 2010, no pet.).

As previously noted, section 5.079 of the property code requires a "seller" of property to "transfer recorded, legal title of the property covered by [an] executory contract to the purchaser not later than the 30th day after the date the seller receives the purchaser's final payment due under the contract." Tex. Prop. Code Ann. § 5.079(a). A seller who violates this requirement is liable to the purchaser for liquidated damages in the amount of $250 per day for each day the seller fails to transfer title between thirty-one and ninety days after the seller receives the purchaser's final

31

payment, and $500 per day thereafter. *See id*. § 5.079(b). The Waldens urge that they were entitled to judgment awarding them section 5.079 liquidated damages beginning on the thirty-first day after the date they paid for the Lot (October 20, 2006, the thirty-first day after September 19, 2006) through December 7, 2007, the date the jury found that title was finally transferred.

The pivotal question governing their entitlement to relief, as the Waldens acknowledge, is whether the Land Contract was an "executory contract" within the meaning of property code section 5.079. *See id*. § 5.079(a). Section 5.079 is a component of chapter 5, subchapter D of the property code, which governs "executory contract[s] for conveyance." *See id.* §§ 5.061-.085 (West 2004 & Supp. 2011). Subchapter D is made applicable "only to a transaction involving an executory contract for conveyance of real property used or to be used as the purchaser's residence" or that of a close relative. *See id.* § 5.062(a). Exempted from the subchapter, in addition to other exemptions or exclusions not relevant here, is "an executory contract that provides for the delivery of a deed from the seller to the purchaser within 180 days of the date of the final execution of the executory contract." *See id.* § 5.062(c).

Subchapter D does not explicitly define "executory contract." The linchpin of the Waldens' position is that "executory contract" under subchapter D must be given its ordinary, general meaning, denoting a contract "that remains wholly unperformed or for which there remains something still to be done on both sides." Black's Law Dictionary 369 (9th ed. 2009). They insist that the Land Contract was "executory" in this sense at all times before closing because both parties, by definition, had remaining obligations to perform.

32

In the Waldens' view, their chief hurdle to recovery under section 5.079 is subchapter D's exclusion of an "executory contract that provides for the delivery of a deed from the seller to the purchaser within 180 days of the date of the final execution of the executory contract." *See* Tex. Prop. Code Ann. § 5.062(c). While appearing to concede that the Waldens and S&J, through Jaehne, "finally executed" the Land Contract on September 19, 2006, and that the agreement in its inception contemplated a closing date within a few days thereafter, the Waldens emphasize that Jaehne later signed a document promising to deliver to the Waldens "clear title with a Title Policy, survey and Deed to this property . . . . on or before March 23, 2007." The Waldens urge that this document effected a modification of S&J's obligation to deliver the deed, extending the deadline to a date beyond the 180-day exclusion period and bringing the Land Contract within section 5.079.

Neither S&J nor Jaehne filed an appellee's brief to join issue with the Waldens' argument, but Shook did, and he advanced a competing construction of "executory contract." Considering the context in which the Legislature used the term, "executory contract," in Shook's view, was intended to have a technical meaning basically synonymous with a contract for deed. A contract for deed is a form of real property conveyance in which the purchaser obtains an immediate right to possession but the seller retains legal title and has no obligation to transfer it unless and until the purchaser finishes paying the full purchase price (and, often, interest, fees, or other related obligations), which is typically done in installments over several years. *See Flores v. Millennium Interests, Ltd.*, 185 S.W.3d 427, 429 (Tex. 2005) (". . . executory contracts [are] also known as contracts for deed. A contract for deed, unlike a mortgage, allows the seller to retain title to the property until the purchaser has paid for the property in full."); *Reeder v. Curry*, 294 S.W.3d 851,

33

856 (Tex. App.—Dallas, 2009 pet. denied) ("[i]n an executory contract for the sale of land, such as the contract for deed in this case, the superior title remains with the seller until the purchaser fulfills its part of the contract" and "[i]f the purchaser defaults under the contract, the seller is entitled to possession of the property"); *Ward v. Malone*, 115 S.W.3d 267, 270-71 (Tex. App.—Corpus Christi 2003, pet. denied) (stating that a "contract for deed is an agreement by a seller to deliver a deed to property once certain conditions have been met" and that it entitled the buyer to immediate possession, that the seller retains title until the purchase price is fully paid, and that the price is typically paid in installments over several years); *Graves v. Diehl*, 958 S.W.2d 468, 470 (Tex. App.—Houston [14th Dist.] 1997, no pet.) (same). A contract for deed differs from a conventional contract for sale of realty, in which the seller and purchaser mutually agree to complete payment and title transfer on a date certain (the "closing date"). *See Flores*, 185 S.W.3d at 429 (comparing a contract for deed with a mortgage); *id.* at 435 (Wainwright, J., concurring) ("in [contracts for deed], legal title to the property does not transfer until after all purchase payments have been made, unlike a traditional mortgage in which legal title transfers upon closing the transaction"). Unlike a contract for deed, under which the buyer has an equitable right, but no obligation, to complete the purchase, *Gaona v. Gonzales*, 997 S.W.2d 784, 786-87 (Tex. App.—Austin 1999, no pet.), the buyer under a typical real estate contract is contractually obligated to complete the purchase and may be liable for breach upon failure to pay the seller, *Carroll v. Wied*, 572 S.W.2d 93, 95 (Tex. Civ. App.—Corpus Christi 1978, no writ) ("In a contract of sale, one party is obligated to sell and the other to purchase."). In effect, a contract for deed serves to provide persons unable to obtain conventional mortgage financing an alternative means of purchasing real property. *See*

*Flores*, 185 S.W.3d at 434-35 (Wainwright, J., concurring) (explaining that residents building homes in the colonias "need this method of financing because they do not have access to traditional mortgage financing"); *Marker v. Garcia*, 185 S.W.3d 21, 26-27 (Tex. App.—San Antonio 2005, no pet.) (noting that enactment of parts of subchapter D responded to a problem with substandard housing developments whose residents did not have access to traditional financing); *Sanchez v. Brandt*, 567 S.W.2d 254, 259 (Tex. Civ. App.—Corpus Christi 1978, no writ) (observing, with reference to contracts for deed, "[i]t is a matter of common knowledge . . . that many poor people are unable to obtain conventional financing when they wish to purchase residential property. Frequently it is necessary for them to pay out the entire purchase price of a tract of land prior to procuring title . . . .").

Shook emphasized that Texas courts, including the Texas Supreme Court, have frequently equated "executory contract" as used in subchapter D with a contract for deed. *See, e.g.*, *Flores*, 185 S.W.3d at 429 (equating the two); *Brown v. De La Cruz*, 156 S.W.3d 560, 566 (Tex. 2004) ("Since 1995, the Texas Property Code has required that sellers by executory contract (or 'contract for deed') of certain residential property in Texas must record and transfer a deed within thirty days of final payment."); *Nguyen v. Yovan*, 317 S.W.3d 261, 270 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (treating "executory contract" under subchapter D as synonymous with "contract for deed"); *Zuniga v. Velasquez*, 274 S.W.3d 770, 771 (Tex. App.—San Antonio 2008, no pet.) (same); *Flowers v. Zuniga*, No. 11-06-00144-CV, 2008 Tex. App. LEXIS 2664, at *2 (Tex. App.—Eastland Apr. 10, 2008, no pet.) (mem. op.) (same); *Sharp v. Smith*, No. 12-07-00219-CV, 2008 Tex. App. LEXIS 666, at *1 (Tex. App.—Tyler Jan. 31, 2008, no pet.)

(mem. op.) (same); *Henderson v. Love*, 181 S.W.3d 810, 812 (Tex. App.—Texarkana 2005, no pet.) (same); *Kirk v. Barnett*, 566 S.W.2d 122, 122 (Tex. Civ. App.—Houston [14th Dist.] 1978, no writ) (equating executory contracts for conveyance with contracts for deed under the predecessor to subchapter D); *see also Graves*, 958 S.W.2d at 472 (equating executory contracts for the sale of land to contracts for deed in a suit not under subchapter D or its predecessor).

Shook also pointed out that subchapter D contains several consumer-protection provisions that, he suggested, would have application to contracts for deed and not conventional contracts for sale of realty. These include:

- section 5.065, which mandates that a "purchaser in default [defined elsewhere as one who has "failed to make a timely payment" or comply with another term] under an executory contract be given 30 days to cure the "default." *See* Tex. Prop. Code Ann. § 5.065.[25]

- section 5.064, which forbids a "seller" from enforcing the remedies of rescission or of "forfeiture and acceleration" unless and until the seller first gives notice of its intent to enforce the remedies and of the purchaser's right to cure under section 5.065. *See id.* § 5.064. Section 5.063, in turn, prescribes the content of the notice under section 5.064. In part, the notice must advise the purchaser that "YOU ARE NOT COMPLYING WITH THE TERMS OF THE CONTRACT TO BUY YOUR PROPERTY," identify the default, and that unless the purchaser cured the default within a time specified in the notice, that "THE SELLER HAS THE RIGHT TO TAKE POSSESSION." *See id.* § 5.063.

- section 5.066, which requires that if the purchaser defaults after paying "40 percent or more of the amount due or the equivalent of 48 monthly payments under the executory contract," the seller cannot enforce the remedies of rescission or of forfeiture, but may have the property sold at public auction following notice and 60 days to cure. *See id.* § 5.063.

- section 5.071, which requires that "[b]efore an executory contract is signed by the purchaser, the seller shall provide to the purchaser" a written statement specifying the purchase price of the property; "the interest rate charged under the contract"; "the dollar amount, or an

---

[25] *See* Tex. Prop. Code Ann. § 5.061 (West 2004) (defining "default" for purposes of subchapter D).

estimate of the dollar amount if the interest rate is variable, of the interest charged for a term of the contract"; the "total amount of principal and interest to be paid under the contract"; "the late charge, if any, that may be assessed under the contract"; and that a prepayment penalty may not be imposed "if the purchaser elects to pay the entire amount due under the contract before the scheduled payment date under the contract." *See id.* § 5.071.

- section 5.073, which prohibits "term[s] of the executory contract" that include certain late-payment fees. *See id.* § 5.073.

- section 5.074, which authorizes the purchaser to "cancel and rescind an executory contract for any reason . . . not later than the 14th day after the date of the contract." *See id.* § 5.074.

- section 5.077, which requires the seller to provide the purchaser, "in January of each year for the term of the executory contract," a statement setting forth "the amount paid under the contract," "the remaining amount owed under the contract," "the number of payments remaining under the contract," and certain information relating to tax and insurance payments on the property. *See id.* § 5.077.

In contrast to the "executory contract" contemplated by these provisions, Shook further contends, the Land Contract was merely a conventional contract for sale of realty, contemplating a discrete closing date at which the parties would conclude an exchange of payment for title rather than a series of payments to the seller extending into the future. He adds that the Waldens' reasoning would imply that every contract for sale of realty would be an "executory contract" subject to subchapter D, at least prior to the closing date, and longer if either party breaches. This would be an absurd result that the Legislature could not possibly have intended, Shook adds, one that would render the limiting phrase "executory contract" superfluous and impose on such contracts numerous provisions that simply do not fit those type of conveyances.

While acknowledging that a contract for deed is one kind of "executory contract" under subchapter D, the Waldens insist that it is not the only kind. Some of our sister courts have stated or suggested as much. *See Yarto v. Gilliland*, 287 S.W.3d 83, 90 n.10

(Tex. App.—Corpus Christi 2009, no pet.) (noting that executory contracts contemplate "that the purchaser complete performance in the future" and that a contract for deed "is a type of executory contract"); *Reeder*, 294 S.W.3d at 856 ("In an executory contract for the sale of land, such as the contract for deed in this case . . . ."). However, no court to date has interpreted or applied "executory contract" under subchapter D as broadly as the Waldens urge here. Instead, the decisions are consistent with a recognition of what is apparent in the structure and wording of subchapter D—that the "executory contract" contemplated by the Legislature, whether or not extending beyond contracts for deed, contemplates that a purchaser satisfy a series of obligations over an extended period of time before the seller has an obligation to transfer title. *See* Tex. Prop. Code Ann. §§ 5.064-.065 (right of purchaser to cure default within 30 days after receiving written notice of default), .066 (granting some equity to purchaser in default who has paid "40 percent or more of the amount due or the equivalent of 48 monthly payments under the executory contract"), .073 (prohibiting certain late-payment fees and prohibiting prepayment penalties if a purchaser pays amount due before the scheduled payment date under the contract), .077 (requiring seller to provide buyer with an annual accounting including "the amount paid," "the remaining amount owed," and "the number of payments remaining under the contract"), .081 (providing right to convert buyer's interest in an executory contract into a recorded legal title if buyer tenders to seller the balance owed), .082 (entitling the buyer to receive from the seller the amount that the buyer owes under the contract), .083-.085 (providing for return of all payments to buyer if seller violates these provisions). The Land Contract, even considering the asserted modification on which the Waldens rely, is not this sort of

contract. The district court did not err in concluding that section 5.079 did not apply. We overrule the Waldens' issues as to S&J and Jaehne.

## CONCLUSION

We reverse the district court's judgment to the extent it imposes liability on Shook and render judgment that the Waldens take nothing on their claims against him. We affirm the district court's refusal to award the Waldens relief under section 5.079 of the property code.

_____

Bob Pemberton, Justice

Before Chief Justice Jones, Justices Pemberton and Henson;
   Concurring and Dissenting Opinion by Justice Henson

Affirmed in part; Reversed and Rendered in part

Filed: March 16, 2012