ACCEPTED
01-14-00104-CV
FIRST COURT OF APPEALS
HOUSTON, TEXAS
11/16/2015 8:50:33 PM
CHRISTOPHER PRINE
CLERK

## IN THE COURT OF APPEALS
## FIRST DISTRICT OF TEXAS AT HOUSTON

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS
11/16/2015 8:50:33 PM
CHRISTOPHER A. PRINE
Clerk

NO. 01-14-00104-CV

WHITE LION HOLDINGS, L.L.C.

Appellant

vs.

THE STATE OF TEXAS

Appellee

On Appeal from
The 98th District Court of Travis County, Texas
Trial Court No. D-1-GV-06-000627 and D-1-GV-13-001068

## APPELLANT'S MOTION FOR REHEARING AND REHEARING EN BANC

Jacqueline Lucci Smith
TBA #: 00786073
LUCCI SMITH LAW PLLC
10810 Katy Freeway, Suite 102
Houston, Texas 77043
Tel.: 832-494-1700
Fax: 832-494-1426
Email: JLS@LucciSmithLaw.com

Joan Lucci Bain
TBA #: 01548020
BAIN & BAIN PLLC
10810 Katy Freeway, Suite 102
Houston, Texas 77043
Tel.: 713-629-6222
Fax: 713-629-6226
JBain@BainandBainlaw.net

# TABLE OF CONTENTS

                                                                             **Page**

TABLE OF CONTENTS…………………………………………………………..i

TABLE OF AUTHORITIES………………………………………………....ii

ISSUES PRESENTED…………………………………………………………..1

I.     REASONS *EN BANC* REVIEW…………………………………………... 2

II.    RELEVANT FACTS OMITTED BY PANEL……………………….. 3

III.   FACTUAL ERRORS IN THE MAJORITY OPINION……………………7

IV.   ARGUMENT AND AUTHORITIES…………………………………...10

        A. TO AFFIRM THE TRIAL COURT'S SEVERANCE, THE PANEL
           IMPROPERLY EXPANDED MEMBER/AGENT LIABILITY IN
           TWO WAYS............................................................................10

           1. The Panel Imposed Unprecedented Duties on a Member of an
             LLC to Guarantee its Statutory and Financial Obligations............12

                a.   Personal Liability is Not Separate Liability........................13

                b. "Person" as Defined in the Water Code Does Not
                   Authorize Personal and Separate Liability.........................15

           2.  The Panel Distorted Statutory Authority for Personal Liability
             of Agents......................................................................16

        B. SEVERANCE WAS AN ABUSE OF DISCRETION AND
           DEPRIVES THIS COURT OF JURISDICTION OVER THE
           APPEAL....................................................................................19

V.    PRAYER……………………………………………………………...20

CERTIFICATE OF SERVICE………………………………………………22

CERTIFICATE OF COMPLIANCE…………………………………………...22

PANEL OPINION DATED SEPTEMBER 24, 2015.............................EXHIBIT 1

## TABLE OF AUTHORITIES

**CASES**

*Crown Life Ins. Co. v. Casteel*,
  22 S.W.3d 378 (Tex. 2000)............................................................................... 11

*Guar. Fed. Sav. Bank v. Horseshoe Operating Co.*,
  793 S.W.2d 652 (Tex. 1990).......................................................................... 11

*In re Merrill Lynch Trust Co. FSB*,
  235 S.W.3d 185 (Tex. 2007)......................................................................... 12

*Jones v. Ray*,
  886 S.W.2d 817 (Tex. App.—Houston [1st Dist.] 1994, orig. proceeding)....... 11

*Light v. Wilson,*
  663 S.W.2d 813 (Tex. 1984)......................................................................... 16

*Maxey v. Citizens Nat'l Bank of Lubbock*, 507 S.W.2d 722 (Tex. 1974)............... 10

*Miller v. Keyser,*
  90 S.W.3d 712 (Tex. 2002) ..............................................................10, 17, 19

*Shook v. Walden*,
  368 S.W.3d 604 (Tex. App.—Austin 2012, pet. denied).................................. 10

*Stewart Title Guar. Co. v. Sterling*,
  822 S.W.2d 1 (Tex. 1991)............................................................................. 11

*Stroud v. VBFSB Holding Corp.*,
   917 S.W.3d 75 (Tex. App.--San Antonio 1996, writ denied).......................19, 20

*Weeks Marine, Inc. v. Garza*,
   371 S.W.3d 157 (Tex. 2012)...................................................................... 11

*Wetzel v. Barnes*,
   691 S.W.2d 598 (Tex. 1985)................................................................. 10, 16

**STATUTES**

Assisted Living Facility Licensing Act ("ALFLA")......................................... 18, 19

TEX. BUS. ORG. CODE §§101.113 and 101.114.................................................. 10, 13

TEX. HEALTH AND SAFETY CODE ANN. § 247.045(a) (Vernon 2014)...................... 18

TEX. HEALTH AND SAFETY CODE ANN. §247.045(h) ............................................. 19

TEX. WATER CODE § 7.031(e) ...................................................................... 18, 19

TEX. WATER CODE § 7.032 ...........................................................................4, 11

TEX. WATER CODE § 7.101 ................................................................................ 15

TEX. WATER CODE § 7.102 ...........................................................................4, 11, 18

**RULES**

Tex. R. Civ. Proc. 41 ....................................................................................... 11

**TO THE HONORABLE JUSTICES OF THE FIRST COURT OF APPEALS:**

This motion for rehearing and rehearing *en banc* is filed by Appellant, White Lion Holdings, LLC ("WLH") in response to the panel opinion and judgment issued on September 24, 2015. *See White Lion Holdings, L.L.C. v. State,* 01-14-00104-CV (Attached Exhibit 1), (cited as *White Lion* at Exhibit 1). Due to space limitations, WLH incorporates its prior briefing on file with Court, especially regarding the constitutional implications and presented in the Motion for Rehearing *En Banc* filed on June 12, 2015. WLH filed its Motion to Supplement the Record on May 26, 2015 which the Panel denied in the opinion issued on September 24, 2015 and for which WLH seeks rehearing. WLH re-urges the Motion as the documents are necessary for consideration of this Motion. The documents referenced as "App. 1-4" are contained in the Appendix concurrently filed with the Motion to Supplement on May 26, 2015.

## ISSUES PRESENTED

1. Did the panel err in affirming an improper severance which allowed the State double recovery against both the company and its member for the same conduct and same violations?

2. Did the panel err in creating new legal duties for members of limited liability companies beyond the narrow exceptions currently recognized?

1

# I.   REASONS *EN BANC* REVIEW

The panel opinion eviscerates important legal safeguards affecting future cases against all owners of corporate entities, particularly members of a limited liability company ("LLC").[1] First, the panel creates unprecedented individual duties for members to personally guarantee the company's compliance with statutory and financial obligations. Second, severance of the member from the company for the same violation creates double recovery, transforming the corporate shield into a sword for the state. Such precedent is contrary to public policy and will have a chilling effect on all business enterprise and development in Texas.

---

[1] The panel's opinion is not limited to members of LLC's and thus its ruling impacts all corporate entities and their owners and officers equally.

## II. RELEVANT FACTS OMITTED BY PANEL

Vision Metals, Inc., ("Vision"), prior owner of a facility in Rosenberg ("Property") received a permit from the predecessor of Texas Commission on Environmental Quality ("TCEQ") to operate an Industrial Waste Management Site (Permit No. HW-50129-001), the regulatory document which controls activities at the Property. CR. 96-97. A compliance plan (CP-50129) issued the same day addressed monitoring and cleanup of contaminated groundwater. CR 20-21; 116-148; 278. Vision operated a corrective action system ("CAS") consisting of monitoring wells, groundwater recovery and treatment wells and an Acid Neutralization Treatment System ("ANTZ") in conjunction with the manufacturing process that generated hazardous waste. CR 21; 102; 116-118; 190-197; 278. Vision failed to repair inoperable wells and defaulted on all obligations. TCEQ knew Vision was wholly noncompliant with its obligations under the permit and compliance plan. CR 198-225; 357-359.[2] Despite Vision's default, TCEQ never made a claim against Vision's closure and post closure insurance policy (financial assurance) or filed any enforcement action. CR 285. Vision filed for bankruptcy in 2000.

In April, 2004, WLH acquired the Property from Vision through a bankruptcy auction; personal property and business fixtures were sold to others. CR. 43-84. At the time, the CAS was damaged but operational and needed some repairs. CR 198-

---

[2] 2004 inspection report establishes TCEQ knew wells were inoperable. CR 198-225.

3

225. The bankruptcy order required WLH allow buyers access between April and August, 2004 to remove machinery, equipment and other items. CR 50; 69; 282-284. Meanwhile, the obligations of CP-50129 were transferred to WLH. CR 22; 168-169. As part of the Purchase Agreement, Vision's financial assurance also was assigned to WLH, and remained in effect until January 11, 2005. CR 292; 294-304.[3]

When WLH acquired unfettered control of the Property, there was significant damage to the Property and CAS, including gas, water and electrical systems necessary for operation. WLH was left with significant property damage, a destroyed CAS, no utilities, machinery or equipment necessary to operate the CAS and consequently, no way to comply with the plan or permit. CR 282-285; 372-515.

The State remained idle and did not file a claim against the insurance policy in effect. Instead, after the policy lapsed, enforcement actions were filed against WLH and its member, Bernard Morello, under TEX. WATER CODE §§ 7.102, 7.032. CR 3-14; 280. Ironically, the judgments against WLH and Morello are based on the failure to obtain financial assurance which was available but the State failed to utilize.

Even prior to WLH ownership, the United States Environmental Protection Agency ("EPA") notified Vision and TCEQ that a study indicated there was little likelihood groundwater used for human or animal consumption or irrigation was

---

[3] Contrary to summary judgment standards, the panel rejected this evidence and approved fines and penalties assessed as early as October, 2004.

affected by the existing contamination and several alternative corrective actions were available in lieu of the existing CAS network. CR 305-356. For several years, WLH worked with the EPA (and TCEQ) to modify the outdated and unfeasible plan and permit, gaining valuable information and investigating alternatives. The EPA even assisted WLH in drafting correspondence to the TCEQ. CR. at 361-363. The EPA suggested an alternative plume management plan to monitor the ground water. CR 328; 360-363; 365. In order to implement this approach and modify the existing plan, WLH needed the approval of TCEQ and enforcement action abated. CR 365. After TCEQ refused, the EPA disqualified the Property. CR 21-22; 268-270.

Although a formal request for major modification to the plan was not filed, the negotiations were ongoing, both before and during the pendency of the case, regarding such modifications. WLH also allowed TCEQ access to conduct numerous inspections of the Property. CR 280. When negotiations fell through, with little notice and no additional discovery, the State filed its motion for summary judgment against WLH only, and sought severance within its motion. (App. 1, State MSJ p. 24-25).

WLH filed a sworn motion for continuance to allow time to confer with experts to determine *the cost and feasibility* of restoring or modifying the existing remedial system, issues central to its defense that required expert testimony. CR 516-530; 1 RR 12. Furthermore, despite the ongoing discussions and cooperation by WLH, the State did not provide WLH copies of the 2005 and 2008 TCEQ inspection reports

5

until August 21, 2013 or a copy of the July 29, 2013 TCEQ inspection report until shortly before the summary judgment hearing. CR 518. The State's failure to timely provide these reports prevented WLH from obtaining an *expert report* for its response to the summary judgment motion to refute issues identified in the reports and raised in the State's motion, also central issues. The panel opinion rebukes WLH for supposedly doing nothing for several years and not presenting evidence of the cost of repairing the system. *White Lion* at 17. The panel even dismisses the significance of the evidence of numerous lawsuits detailing the damage to the Property which WLH filed, while the State did nothing to prosecute its case during those same years. *Id.* The State's sudden change of tactic left WLH with no time to prepare its defense to a case that it had been working toward resolving.

Both judgments against WLH and Morello are based on two violations: (1) WLH failed to comply with CP-50129; and (2) WLH failed to acquire financial assurance in the amount of $574,000. As to WLH, the State stipulated to the minimum daily fine of $50 for each violation (avoiding a fact issue on the fine). CR. at 31. The trial court severed WLH, transforming the interlocutory summary judgment into a final one and leaving a pending case against Morello. CR 549-554, 629. After briefing herein, the State successfully moved for summary judgment against Morello for the same violations against WLH, again stipulating to the minimum fines. App. 1. The State made clear that its claims against Morello *were*

6

***not based on independent tortious acts*** **and** ***did not seek to pierce the corporate veil.*** App. 4, Ex. G at 14, 34. Accordingly, the judgment against Morello cannot not based on his individual, independent conduct, rather it is admittedly based on the fact that "*Morello [is] operator and sole decision maker of White Lion . . .*" App. 1, Pl's MSJ at p. 29.

## III.   FACTUAL ERRORS IN THE MAJORITY OPINION

1. **The State's case against Morello is not based on his individual "actions and failures to act, distinct from WLH's actions and inactions."** *White Lion* at 7. Rather the case is wholly based on "*his company [failing] to perform* its duties under the Compliance Plan." State Resp. to Motion for Rehearing at 18.

2. **There were no acts that Morello "personally took or failed to take"… "that resulted in WLH's violation of the compliance plan…"** *White Lion* at 8. The evidence is undisputed and the State concedes that all Morello's acts or omissions were as the member of the company in furtherance of company interests.

3. **Morello did not "purchase the site personally and assign it to White Lion" nor did he have "his own obligations with respect to the site[.]"** *White Lion* at 7. The State did not allege Morello owned the Property. App. 4. Ex. G.  at 33. While it is true that Morello bid on the Property, it is also true that Morello

7

assigned his rights to purchase the Property to WLH. CR at 76. Vision conveyed the Property directly to WLH. CR at 78-84. The evidence conclusively establishes Morello never owned the Property.

4. **It is not true that Morello "lacked the expertise to manage the site and made no efforts to manage it until the State filed suit[.]"** *White Lion* at 8. Shortly after acquiring the property, WLH, through Morello, worked diligently to identify and develop an alternative monitoring and remediation plan that was appropriate for the current conditions and use of the Property. CR 22; 265-267; 360-365. The State refused to abate the suit which the EPA required to finalize the recommendation so the request for modification could be filed and approved. CR 21-22; 268-270. In addition, WLH maintained soil stabilization areas and secured the site. CR 285.

5. **WLH did provide financial assurance for a period of time after purchase.** Although the panel disregards the financial assurance that WLH acquired through assignment with its purchase, claiming that the correspondence authorizing assignment did not prove it was actually assigned, the evidence, at the very least, creates an inference that the financial assurance was assigned and provided, precluding summary judgment. CR at CR 292; 294-304.

8

6. **The EPA was "ready, willing and able" to work with WLH to gain approval and implement the alternative plan.** EPA would not assist unless the enforcement action was abated, which the State refused. CR. at 365. Only after the State refused (and nearly a year later) did the EPA withdraw its recommendations and find "such an approach was not feasible." CR. at 276-277; *White Lion* at 3.

## IV. ARGUMENT AND AUTHORITIES

### A. TO AFFIRM THE TRIAL COURT'S SEVERANCE, THE PANEL IMPROPERLY EXPANDED MEMBER/AGENT LIABILITY IN TWO WAYS.

The panel shattered pro-business public policy of Texas and turned Texas law on its head when it failed to recognize basic principles required to impose personal liability on company members/officers. Texas law allows personal liability when:

- the corporate veil is pierced;
- the member commits a fraud or tortious act; or
- the regulation specifically provides an exception (statutory exception).

*See,* TEX. BUS. ORG. CODE §§101.113 and 101.114; *Shook v. Walden*, 368 S.W.3d 604, 613–14 (Tex. App.—Austin 2012, pet. denied); *Miller v. Keyser* 90 S.W.3d 712, 717 (Tex. 2002); *Wetzel v. Barnes*, 691 S.W.2d 598 (Tex. 1985). *See also, Maxey v. Citizens Nat'l Bank of Lubbock*, 507 S.W.2d 722, 726 (Tex. 1974) (citation omitted). None of these exceptions are present here. The State admits it did not seek to pierce the corporate veil and that its claims are not based on tortious conduct. Leaving only the statutory exception, the panel confused specific liability statutes with tortious conduct statutes. In so doing, it allowed personal liability without any legal basis.

The panel incorrectly uses the personal liability of Morello to justify the severance of the case against the member from the case against the company, violating the one-satisfaction rule. Severance is proper only when: (1) the controversy involves more than one cause of action; (2) the severed claim is one that could be asserted independently in a separate lawsuit; and (3) the severed actions are not so

10

interwoven with the other claims that they involve the same facts and issues. *Guar. Fed. Sav. Bank v. Horseshoe Operating Co.*, 793 S.W.2d 652, 658 (Tex. 1990); Tex. R. Civ. Proc. 41. If a court severs a claim *and any of the three elements are not satisfied*, the result is an abuse of discretion. See *Jones v. Ray*, 886 S.W.2d 817, 822 (Tex. App.—Houston [1st Dist.] 1994, orig. proceeding)(emphasis added).

Rule 41 prevents violation of the one-satisfaction rule, which applies when multiple defendants commit the same act or when multiple defendants commit different acts that result in a single injury. *Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 391 (Tex.2000). See also *Weeks Marine, Inc. v. Garza*, 371 S.W.3d 157, 162 (Tex.2012) ("The basis of a double recovery challenge is that a party recovered twice for one injury."). The fact that more than one defendant may have caused the injury or that there may be more than one theory of liability does not modify this rule. *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 8 (Tex.1991).

In affirming severance to sustain subject matter jurisdiction, the panel improperly expanded member/agent liability and rewrote Texas law in two ways. First, the panel created unprecedented duties on members to guarantee the conduct of the company. Second, the panel expanded the reach of the Water Code, interpreting it as a statutory exception to the corporate shield without clear legislative authority, imposing liability on the member and allowing double recovery.

11

**1. THE PANEL IMPOSED UNPRECEDENTED DUTIES ON A MEMBER OF AN LLC TO GUARANTEE ITS STATUTORY AND FINANCIAL OBLIGATIONS.**

The import of the panel's opinion regarding personal liability is that members are now personally liable for violations of company obligations. Any act or omission (violation) by the company necessarily stems from acts taken by the member because companies can act only through human agents. *In re Merrill Lynch Trust Co. FSB*, 235 S.W.3d 185, 188 (Tex. 2007). Artificially separating one from the other, the panel created a path to turn single "human acts" into multiple *legal* acts (and multiple judgments). Simply by couching the "act" of the individual in the terms of "allowed, permitted or directed [the company] to…" does not transform the act itself into an act separate from the company and violates long-standing precedent.

Severance of claims against the company and its member creates uncontemplated duties upon members to *personally guarantee* the conduct of the company and its financial obligations, separate and distinct from the company's contemplated legal duties. The panel's opinion eviscerates liability protections afforded members who will always be *human actors* since companies must "act" through these individuals. *Id.* Thus any "act or omission" by the company is also an "act or omission" by the individual member and therefore, rather than being a shield from liability, the company structure is actually a pathway to duplicate recovery and double jeopardy.

12

### a) PERSONAL LIABILITY IS NOT SEPARATE LIABILITY.

Allowing personal liability[4] is one thing, but allowing severance under the premise that these are separate causes of action, not interwoven in facts and issues to somehow justify a double recovery is unconscionable. The idea that Morello had a separate, personal duty to ensure the company did no wrong is unprecedented. Furthermore, the claims are based on the exact same actions taken (or not taken) which necessarily effected the same violation and this fabricated separation of the company "doing' and the member "directing" is disingenuous. In the panel's world, members will be subjected to double fines and penalties because the LLC designed to provide a company shield for its members instead creates two legal targets in direct contravention of clear statutory mandate. TEX. BUS. ORG. CODE §§101.113 and 101.114. Although the "act" occurs only once, the illusion created by the panel sees two separate and distinct acts; one under the hat of the company (WLH) and another under the hat of its member (Morello). Such a stretch clearly violates the one satisfaction rule.

Even if the panel were correct that these "human actors" are legally separate, the panel opinion allows multiple persons to be separately liable for the same injury (violation). The judgment against WLH is based on its violation of the compliance

---

[4] WLH in no way admits or suggests that Morello is personally liable.

13

plan. Morello was fined because "he personally took or failed to take actions *that resulted in* White Lion's violation of the compliance plan…and directing White Lion not to comply with the compliance plan…" *White Lion* at 8. The same faulty logic was applied to the duty and obligation to provide financial assurance. The failure to provide financial assurance is most disturbing. Without requesting or securing from Morello a personal guarantee at the time it assigned the obligations of Vision to WLH, the State made Morello not just liable, but separately liable for the financial obligations of WLH. Another clear violation of the one satisfaction rule.

In sum, the panel ignores the one satisfaction rule in two ways: (1) it holds a single actor (company) liable in multiple capacities (member and company); and (2) it allows double recovery for a single violation. The impact is undeniable; the State is free to recover against a company for failing to comply with a plan; then, after securing payment, recover another judgment against the member(s) for "allowing or permitting" the company violation. How can the panel maintain that these are not the same claim? *White Lion* at 7-8. Ignoring for the moment the constitutional and strict statutory construction requirements where state action is involved[5], where in Texas jurisprudence has a court allowed separate causes of action against a company and its member for the same offense; one for committing the offense and the other for allowing the offense to be committed? Such a circular and strained application

---

[5] See Amended Motion for Rehearing *En Banc* filed June 12, 2015 at 17-21.

14

completely abolishes the statutory shield, creates a corporate target and flies in the face of Texas law.

### b) "PERSON" AS DEFINED IN THE WATER CODE DOES NOT AUTHORIZE PERSONAL AND SEPARATE LIABILITY.

The State's summary judgment motion against Morello began with the premise that, under Texas Water Code Section 7.101, "a person" incurs civil liability where he "cause[s], suffer[s], allow[s], or permit[s] a violation of a statute within the commission's jurisdiction or a rule adopted or an order or permit issued under such a statute" and that the term "person" includes individuals. The panel ignores long standing legal principles that distinguish between actions of the corporation and actions of the individual. Just because Morello is an individual does not make him personally and separately liable for violations of the company. This logic creates a new cause of action against every member, officer, director or owner of any entity that is found liable because he or she "didn't stop the violation" and makes them individually liable for a second penalty.

The panel opines that Morello's liability was direct and flowed from the mere fact that he was a "person" in violation of Texas Water Code Section 7.101. The panel states severance was proper because the "ways in which White Lion and Morello allegedly violated the compliance plan are different." *White Lion* at 8. The panel ignores the fact that Morello was not subject to the compliance plan and had no duty

15

under the plan other than as the member of WLH. Morello never owned the Property and never assumed any obligations under the plan or permit. The effect of allowing the severance and duplicate judgments to stand is to create a new standard making members liable for the acts and omissions of the company merely because they are "human actors." There is simply no precedent for imposition of such personal, duplicate liability against the member. The ruse that Morello "directed White Lion not to comply with the compliance plan" in order to assess liability for separate acts flies in the face of all reason and logic.

## 2. THE PANEL DISTORTED STATUTORY AUTHORITY FOR PERSONAL LIABILITY OF AGENTS.

The panel misconstrues the statutory exception to the general rules regarding personal liability of members. Under traditional standards, for Morello to be personally liable, the State must show actual tortious conduct. *Wetzel v. Barnes*, 691 S.W.2d 598; *Light v. Wilson* 663 S.W.2d 813 (Tex. 1984). This makes perfect sense because every person, individual or otherwise, has a duty to avoid tortious conduct. The State expressly denied liability based upon independent tortious conduct:

> Morello asserts that compliance with the Compliance Plan has been caused by or otherwise rendered impractical by third parties. This matter is not a tort action. This is a statutory enforcement action brought against Morello as operator and sole decision maker of White Lion . . . (App.. 1, Pl. MSJ.)

16

There can be no doubt the judgment against Morello is not derived from an independent tort. (App.. 1, Pl. MSJ). Instead, the State openly conceded it was seeking a second judgment against Morello because "Morello is White Lion." (App.. 4, Ex. G, Supp. RR at 10:14). Accordingly, the only legal basis for Morello to be held liable is through a clear and unequivocal statutory exception. Instead of looking to statutes which impose liability on company owners and operators, the panel relied on the DTPA and *Keyser*, for the proposition that "[s]tatutes providing for liability of any "person" in violation allow courts to render judgments against both corporate entities and their agents." *White Lion* at 8.

*Keyser,* is a DTPA suit against a home builder, D.B. Interests, Inc. ("DBI"), and Keyser, the sales agent, for fraud and misrepresentations. 90 S.W.3d 712. After the court dismissed claims against DBI as untimely, trial proceeded against Keyser. *Id*. The jury found Keyser liable but the intermediate court of appeals reversed, holding a corporate agent acting within the scope of his employment could not be personally liable under the DTPA. *Keyser, 90 S.W.3d at 717*. On review, the Supreme Court reversed and recognized "Texas' longstanding rule that a corporate agent is personally liable *for his own fraudulent or tortious acts*." *Id*. (emphasis added). *Id* at 717. As such, *Keyser* does not provide authority for a statutory exception to liability, but for actions based in tort, which this is not.

In order to avoid the requirement that Morello committed fraud or a tort, the State argued that "the actions are viewed, not in the context of a tort, but in the context of whether such actions amount to causing, suffering, allowing, or permitting a violation of law" as set forth in Texas Water Code section 7.102. (Pl's MSJ Reply at 5.) This misses the point. In order to find Morello personally liable under a statutory exception in the Water Code, it is not necessary to determine if Morello is a "person" (of course he is) but whether there is language purporting to specifically authorize liability of and claims against members. The Water Code is clear: "If *a person named in the order* does not comply with the order, the commission may assess an administrative penalty or seek a civil penalty in accordance with this chapter. TEX. WATER CODE §7.031(e). Morello is not named in the plan or permit.

One statute that *specifically provides otherwise* is the Assisted Living Facility Licensing Act ("ALFLA").

> Except as provided by Subsections (b) and (c), *a person who violates* this chapter or *who fails to comply with a rule* adopted under this chapter and whose violation is determined by the department to threaten the health and safety of a resident of an assisted living facility is subject to a civil penalty of not less than $100 nor more than $10,000 for each act of violation. Each day of a continuing violation constitutes a separate ground of recovery. TEX. HEALTH AND SAFETY CODE ANN. § 247.045(a) (Vernon 2014).

18

Unlike the Water Code, ALFLA provides a specific statutory exception to the corporate shield by authorizing a "controlling person[6]" to be held liable:

> If a person who is liable under this section fails to pay any amount the person is obligated to pay under this section, the state may seek satisfaction from any owner, other controlling person, or affiliate of the person found liable. The owner, other controlling person, or affiliate may be found liable in the same suit or in another suit on a showing by the state that the amount to be paid has not been paid or otherwise legally discharged. The executive commissioner by rule may establish a method for satisfying an obligation imposed under this section from an insurance policy, letter of credit, or other contingency fund.
>
> TEX. HEALTH AND SAFETY CODE ANN. §247.045(h).

The Water Code does not contain an analogous provision and instead, as noted by the panel, parallel's the DTPA. Notably, ALFLA allows separate suits against the "controlling person" only *after* the company fails to pay the fines and therefore prevents double recovery. The panel's reliance on *Keyser* is misplaced and the Water Code provisions insufficient to support personal liability of a member.

**B.      SEVERANCE WAS AN ABUSE OF DISCRETION AND DEPRIVES THIS COURT OF JURISDICTION OVER THIS APPEAL.**

WLH and Morello are now in the impossible position of having to fight the same case on two fronts before two different appellate courts, with neither court having the full record before it. *See Stroud v VBFSB Holding Corp.*, 917 S.W.2d 75,

---

[6] The definition of "controlling person" clearly includes a sole, managing member. TEX. HEALTH & SAFETY CODE §247.005.

78 (Tex. App. -- San Antonio 1996, *writ denied*) (dismissal of compulsory counterclaims improperly severed, "placed [appellant] in the impossible position of having to perfect a new appeal based on the then-final judgment before this court had issued its dismissal of his first appeal.").

Conflicting authorities among the appellate courts over whether an improper severance deprives an appellate court of jurisdiction makes rehearing essential to re-examine this Court's jurisdiction and perhaps resolve the procedural dilemma that has plagued courts and litigants. Several courts, including the Austin Court of Appeals, have held that a severance that splits a cause of action or single ground of recovery deprives the appellate court of jurisdiction, particularly where the severance is needed to make the judgment final.

## V.    PRAYER

Appellant White Lion Holdings LLC, requests that this Court grant this Motion for Rehearing *En Banc*, and upon rehearing, withdraw the September 24, 2015 panel opinion, reverse the order of severance and dismiss this appeal for lack of jurisdiction. WLH prays for such further relief to which he may show himself justly entitled.

Respectfully Submitted,

LUCCI SMITH LAW PLLC


By: /s/ *Jacqueline Lucci Smith*
Jacqueline Lucci Smith
TBA #: 00786073
10810 Katy Freeway, Suite 102
Houston, Texas 77043
Tel.: 832-494-1700
Fax: 832-494-1426
Email: JLS@LucciSmithLaw.com

BAIN & BAIN PLLC

By: /s/ *Joan Lucci Bain*
Joan Lucci Bain
TBA #: 01548020
10810 Katy Freeway, Suite 102
Houston, Texas 77043
Tel.: 713-629-6222
Fax: 713-629-6226
Email: JBain@BainandBainlaw.net

21

## CERTIFICATE OF SERVICE

I certify that a copy of this Appellant's Motion for Rehearing and Rehearing *En Banc* was served on counsel for the State, Craig Pritzlaff, by email on November 16, 2015.

/s/ *Jacqueline Lucci Smith*

_____

Jacqueline Lucci Smith

## CERTIFICATE OF COMPLIANCE

I certify that the computer program used to prepare this document counted 4496 words in the pertinent parts of the document in accordance with TRAP 9.4(i)(2)(D).

/s/ *Jacqueline Lucci Smith*

_____

Jacqueline Lucci Smith

EXHIBIT 1

Opinion issued September 24, 2015



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-14-00104-CV

———————————

## WHITE LION HOLDINGS, L.L.C., Appellant

## V.

## THE STATE OF TEXAS, Appellee

On Appeal from the 98th District Court
Travis County, Texas
Trial Court Case No. D-1-GV-13-001068

## MEMORANDUM OPINION ON REHEARING

The trial court entered summary judgment for the State of Texas that White

Lion Holdings, L.L.C. violated the terms of a compliance plan issued by the Texas

Commission on Environmental Quality (TCEQ).  White Lion appeals, arguing in

two issues that the trial court improperly denied its motion for continuance and that

the summary-judgment evidence raised questions of material fact sufficient to prevent summary judgment.  We affirm.[1]

### Background

In 2006, the State initiated this lawsuit, alleging that White Lion violated a waste-management compliance plan issued by TCEQ.  The plan and a contemporaneously-issued permit govern the monitoring, treatment, and management of surface wastewater impoundments and a plume of contaminated groundwater at a facility now owned by White Lion and formerly used for pipe manufacturing in Rosenberg, Texas.  During its operational life, the facility generated hazardous wastewater that was treated on-site in a system that included five surface impoundments.  The prior owner of the facility, Vision Metals, discovered that the impoundments were sources of groundwater contamination, including elevated concentrations of cadmium, cobalt, lead, barium, chromium, nickel, silver, zinc, iron, sulfate, and acidic compounds.

---

[1]     On April 9, 2015, we rendered our original opinion in this case. On May 26, 2015, White Lion filed three motions: a motion to supplement the record, a motion for rehearing, and a motion for rehearing en banc.  It subsequently amended the motion for panel rehearing and the motion for rehearing en banc.  We deny the motion to supplement the record and motion for panel rehearing, but withdraw our opinion and judgment of April 9, 2015, and issue this opinion and a new judgment in their stead.  We dismiss the motion for rehearing en banc as moot. *See, e.g.*, *Brookshire Bros., Inc. v. Smith*, 176 S.W.3d 30, 41 (Tex. App.—Houston [1st Dist.] 2005, pet. denied).

In 1988, the TCEQ's predecessor, the Texas Natural Resources Conservation Commission, issued Hazardous Waste Permit 50129-001 to Vision Metals to govern the management, closure, and long-term care of the wastewater impoundments. Contemporaneously, it issued to Vision Metals Compliance Plan 50129. The compliance plan has been modified several times since then.

White Lion acquired the facility in a bankruptcy sale in April 2004. At the same sale, various third parties purchased machinery and equipment at the property. According to White Lion, some of those third parties damaged the facility while removing their property in the period from April 2004 through August of that year. White Lion estimated the costs of repairs to exceed $1.4 million and initiated lawsuits to recover damages from the third parties.

Meanwhile, the existing permit and compliance plan were transferred to White Lion. White Lion, however, did not provide the State with a required "financial assurance" mechanism, such as a bond or irrevocable letter of credit, guaranteeing its performance of its obligations under the permit and compliance plan. It did, however, request an extension of time to provide such assurance. White Lion also discussed with the United States Environmental Protection Agency switching the site to a "plume management approach," which would simplify management of the site, but the EPA told White Lion that such an approach was not feasible.

3

TCEQ gave White Lion an extension of time to address outstanding compliance issues and submit an amendment to the compliance plan but did not extend the time for White Lion to provide financial assurance. White Lion never submitted any application to amend the compliance plan and never provided any financial assurance.

In 2006, the State sued White Lion for violations of the compliance plan, seeking civil penalties under the Water Code, unpaid hazardous waste facility fees, an injunction to secure White Lion's performance of its duties under the compliance plan, and attorney's fees. The State later amended its petition, naming White Lion's owner, Bernard Morello, as an additional defendant.

The case was set for trial in 2008, continued, set again in 2011, and continued again. In August 2013, the State filed a motion for summary judgment. White Lion responded, arguing in part that full compliance with the plan was impossible, that it had complied to the extent possible, and that injunctive relief was improper in the absence of a showing of a risk of irreparable injury. White Lion also moved for a continuance to obtain an expert opinion on the costs and feasibility of repairs to the site.

The trial court held a hearing at which it denied White Lion's motion for continuance and then granted the State's motion for summary judgment. It entered judgment that the State recover from White Lion (1) civil penalties of $325,600,

4

(2) unpaid hazardous waste facility fees of $129,464.15, (3) pre-judgment interest on the unpaid hazardous waste facility fees, (4) attorney's fees, (5) costs of court, and (6) post-judgment interest.[2]  It also enjoined White Lion as follows: "White Lion shall [immediately] comply with each limitation, requirement, and condition of the Compliance Plan."  In the same order, the trial court severed the State's case against Morello, rendering the judgment against White Lion final.  The State later obtained summary judgment in the severed case against Morello.

In two issues, White Lion appeals, arguing, first, that the trial court erred in denying White Lion's motion for continuance and, second, that the trial court improperly granted summary judgment because White Lion raised questions of material fact.[3]

## Our Jurisdiction over this Appeal

On rehearing, White Lion argues for the first time that we lack jurisdiction to hear this appeal.  It argues that the State's case against Morello was improperly severed from the case against White Lion and that, under controlling authority, a

---

[2]    The original judgment incorrectly stated, under the heading "Post-Judgment Interest," that "[t]he State shall recover *pre*-judgment interest on all amounts awarded in this judgment at the annual rate of 5.00%."  On the State's motion, the trial court entered judgment *nunc pro tunc* correcting "pre-judgment" in that section to "post-judgment" and making other clerical corrections.

[3]    On January 7, 2014, the Texas Supreme Court ordered this appeal transferred from the Court of Appeals for the Third District of Texas.  See TEX. GOV'T CODE ANN. § 73.001 (West 2013) (authorizing transfer of cases).  We are unaware of any conflict between the precedent of the Court of Appeals for the Third District and that of this Court on any relevant issues.  *See* TEX. R. APP. P. 41.3.

5

judgment rendered after an improper severance is not an appealable, final judgment. In support of this argument, White Lion has submitted to this Court (1) the State's motion for summary judgment against Morello, (2) Morello's response, (3) the final summary judgment against Morello, (4) Morello's motion for new trial, and (5) the "Trial Court Order, if any, denying Motion for New Trial." It asks that we grant leave to supplement the record to include these documents and, having done so, hold that the severance was improper.

White Lion's jurisdictional argument has three parts: (1) the State's case against Morello is based entirely on his status as the sole member of White Lion; (2) the severance order is invalid because it (a) severs a single cause of action into separate claims and (b) severs inextricably intertwined claims against different parties; and (3) an invalid severance requires dismissal under the case law of the Austin Court of Appeals where this appeal was originally filed.

We have jurisdiction only over final judgments "[u]nless there is a statute specifically authorizing an interlocutory appeal." *Cherokee Water Co. v. Ross*, 698 S.W.2d 363, 365 (Tex. 1985) (orig. proceeding) (per curiam); *see Rusk State Hosp. v. Black*, 392 S.W.3d 88, 95 (Tex. 2012). "Jurisdiction over the subject matter of an action may not be conferred or taken away by consent or waiver, and its absence may be raised at any time." *Carroll v. Carroll*, 304 S.W.3d 366, 367

6

(Tex. 2010) (per curiam) (citing *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 445 (Tex. 1993)).

Under Rule 41 of the Texas Rules of Civil Procedure, "[a]ny claim against a party may be severed and proceeded with separately." TEX. R. CIV. P. 41. "This rule grants the trial court broad discretion in the matter of severance and consolidation of causes." *Guar. Fed. Sav. Bank v. Horseshoe Operating Co.*, 793 S.W.2d 652, 658 (Tex. 1990) (citing *McGuire v. Commercial Union Ins. Co. of N.Y.*, 431 S.W.2d 347 (Tex. 1968)). "The trial court's decision to grant a severance will not be reversed unless it has abused its discretion." *Id.* (citation omitted). "A claim is properly severable if (1) the controversy involves more than one cause of action, (2) the severed claim is one that would be the proper subject of a lawsuit if independently asserted, and (3) the severed claim is not so interwoven with the remaining action that they involve the same facts and issues." *Id.* (citations omitted).

The first step of White Lion's argument is factually incorrect: the State's motion against Morello focuses on Morello's actions and failures to act, as distinct from White Lion's actions and inactions. Among other theories, the State argues that Morello is liable for penalties because (1) he purchased the site personally and assigned it to White Lion, but did not himself comply with his own obligations with respect to the site; (2) as a corporate officer, he can be held personally liable

7

for penalties under the Water Code; (3) he lacked the expertise to manage the site and made no efforts to manage it until the State filed suit; and (4) he personally took or failed to take actions that resulted in White Lion's violation of the compliance plan, such as removing the groundwater treatment system, throwing away "monitoring well protective housing caps," and directing White Lion not to comply with the compliance plan in various ways.

The second step of White Lion's argument is also flawed. The severance order did not split one cause of action, but rather split two causes of action on the same legal theory: one claim against each defendant. Nor did it split inextricably intertwined claims. The claims against White Lion and those against Morello are based on the Water Code, which imposes liability on any "person who causes, suffers, allows, or permits a violation of a statute, rule, order, or permit relating to any . . . matter within [TCEQ's] jurisdiction to enforce." TEX. WATER CODE. ANN. § 7.102 (West 2008). Statutes providing for liability of any "person" in violation allow courts to render judgments against both corporate entities and their agents. *E.g.*, *Miller v. Keyser*, 90 S.W.3d 712, 715–18 (Tex. 2002) (because Deceptive Trade Practices Act imposes liability on "any person" who violates it, both companies and their agents can be held liable). The ways in which White Lion and Morello allegedly violated the compliance plan are different. Moreover, to the extent the facts supporting the State's claims against White Lion are intertwined

8

with those supporting the claims against Morello, those facts are undisputed. No party disputes, for example, that no monitoring is being performed at the site or that the site's remediation, monitoring, and control systems are offline, disabled, dismantled, or missing entirely. In other words, the claims overlap only with respect to facts that are conclusively established in the record, and there is no risk that a severance would create inconsistent judgments.

In its motion for rehearing, White Lion also argues for the first time that the severance violates the due process protections and prohibitions on excessive fines in the United States and Texas Constitutions. It did not, however, preserve these arguments by raising them in the trial court, nor did it raise them on appeal. "As a rule, a claim, including a constitutional claim, must have been asserted in the trial court in order to be raised on appeal." *Dreyer v. Greene*, 871 S.W.2d 697, 698 (Tex. 1993). Both due-process and excessive-fines arguments can be waived.[4] By failing to preserve these arguments, White Lion has waived them. TEX. R. APP. P. 33.1(a)(1).

---

[4]  *E.g.*, *In re L.M.I.*, 119 S.W.3d 707, 711 (Tex. 2003) (due process); *Anderson v. McCormick*, Nos. 01-12-00856-CV, 01-12-00857-CV, 2013 WL 5884931, at *3 (Tex. App.—Houston [1st Dist.] Oct. 31, 2013, no pet.) (mem. op.) (due process); *Ratsavong v. Menevilay*, 176 S.W.3d 661, 671 (Tex. App.—El Paso 2005, pet. denied) (due process); *Konkel v. Otwell*, 65 S.W.3d 183, 188 (Tex. App.— Eastland 2001, no pet.) (excessive fines); *Armstrong v. Steppes Apartments, Ltd.*, 57 S.W.3d 37, 49 (Tex. App.—Fort Worth 2001, pet. denied) (both due process and excessive fines).

We hold that the trial court did not abuse its discretion by granting the State's conditional motion for severance. Because the severance was proper, we need not reach the final step of White Lion's argument: whether this Court, as the transferee court of an appeal originally filed in the Austin Court of Appeals, can exercise jurisdiction over a summary judgment that purports to be final but results from an improper severance. Because the documents that White Lion has provided from the State's case against Morello are relevant only to its jurisdictional arguments, we deny White Lion's motion to supplement the record.

We have jurisdiction over this appeal. Accordingly, we proceed to the merits.

**Motion for Continuance**

In its first issue, White Lion argues that the trial court erred in denying White Lion's motion for continuance. White Lion requested a continuance on two occasions. First, in its response to the State's motion for summary judgment, it requested "that any hearing on [the motion] be reset for at least 90 days to give [White Lion] time to consult with experts to determine what remedial action is feasible." In that response, it admitted that the facility's mitigation and monitoring systems had no electrical power and were not operational, arguing that "[c]ompliance with the [Compliance] Plan has been rendered impractical and commercially and economically [i]nfeasible by damages to the facility by third

10

parties." White Lion then filed a motion for continuance, asking "that the court reset the hearing [on] the State's [motion for summary judgment] for 90 days . . . to give [White Lion] time to confer with experts to determine the cost and feasibility of restoring the existing remedial system and/or modifying the remedial system." According to White Lion, it "want[ed] to resolve this matter but need[ed] a reasonable time to evaluate the situation." In the motion, it acknowledged that it needed "an extension to comply with TCEQ's requests" and that, as of August 2013, White Lion "need[ed] to quickly come into full compliance with the existing [compliance] plan." The trial court denied the motion for continuance at the start of the hearing on the motion for summary judgment.

## A. Standard of review

We review a trial court's ruling denying a motion for continuance for an abuse of discretion. *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 800 (Tex. 2002); *Carter v. MacFadyen*, 93 S.W.3d 307, 310 (Tex. App.—Houston [14th Dist.] 2002, pet. denied). A trial court abuses its discretion when it reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law. *Marchand*, 83 S.W.3d at 800. The trial court may order a continuance of a summary judgment hearing if it appears "from the affidavits of a party opposing the motion that he cannot for reasons stated present by affidavit facts essential to justify his opposition." TEX. R. CIV. P. 166a(g). In a first motion for continuance

11

based on the ground that testimony is needed, the affidavit supporting the motion must (1) show that the testimony is material and (2) state that due diligence has been used to procure the testimony, describing the diligence used and why it failed, if known. TEX. R. CIV. P. 252. In determining whether there has been an abuse of discretion, we view the evidence in the light most favorable to the trial court and indulge every presumption in favor of the judgment. *Hatteberg v. Hatteberg*, 933 S.W.2d 522, 526 (Tex. App.—Houston [1st Dist.] 1994, no writ) (citing *Parks v. U.S. Home Corp.*, 652 S.W.2d 479, 485 (Tex. App.—Houston [1st Dist.] 1983, writ dism'd)).

## B.    The trial court did not abuse its discretion

White Lion has not shown that the trial court abused its discretion by denying the requested continuance. White Lion acquired the property in April 2004. TCEQ transferred the then-existing permit and compliance plan to White Lion and issued a revised permit and compliance plan identifying White Lion as the permittee and property owner in July 2004. The State initiated this suit in April 2006 and filed its motion for summary judgment in August 2013. White Lion thus had possession of the property for over nine years and notice of the State's claims for more than seven years before the summary-judgment motion. But it admits that it made no attempt to retain an environmental consultant during that period of over nine years, waiting until just two weeks before the State filed its motion for

12

summary judgment to begin its search. White Lion makes no attempt in either its motion for continuance or its appellate brief to explain why it could not have retained an expert and obtained a report before that time.

Further, White Lion did not articulate in its motion for continuance why it needed an expert's opinion before the motion for summary judgment hearing. It stated only that it wanted "time to confer with experts to determine the cost and feasibility of restoring the existing remedial system and/or modifying the remedial system." But those were not issues before the trial court when it considered the motion for summary judgment. That motion addressed only whether White Lion had complied with the compliance plan and governing law and, if not, what civil penalties, unpaid fees, and injunctive relief should be assessed against it. White Lion's evidence, if obtained, would have pertained to the cost of remediation, not White Lion's liability or the calculation of penalties or fees for its past noncompliance. Indeed, White Lion made no attempt to connect the expert opinions that it sought to any of the claims on which the State obtained summary judgment.

We also note that the affidavit supporting the motion for continuance did not describe the evidence that White Lion sought, show that the evidence is material, state that due diligence has been used to procure the evidence, or describe the diligence and why it failed, if known. TEX. R. CIV. P. 252.

Because White Lion failed to demonstrate that it needed a continuance to obtain evidence essential to its defense, we hold that the trial court did not abuse its discretion in denying the motion for continuance.  Accordingly, we overrule White Lion's first issue.

**Motion for Summary Judgment**

In its second issue, White Lion argues that the trial court erred in granting the State's motion for summary judgment.  White Lion contends that it demonstrated the existence of genuine issues of material fact in five categories: (1) whether its compliance was excused under the compliance plan's force majeure clause; (2) whether the State "misrepresented" to the trial court the financial assurance requirements to which White Lion is subject; (3) whether the hazardous waste permit fees awarded in the judgment were "legally valid"; (4) whether the State provided sufficient evidence to obtain injunctive relief; and (5) whether the State improperly sought judgment as to lands owned by White Lion but not subject to the permit or compliance plan.  We will address each argument in turn.

**A.     Standard of review**

We review a trial court's grant of summary judgment de novo.  *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009).  Rule of Civil Procedure 166a(c) provides that a movant is entitled to summary judgment if the summary-judgment evidence establishes that "there is no

14

genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law on the issues expressly set out in the motion or in an answer or any other response." TEX. R. CIV. P. 166a(c); *Am. Tobacco Co., Inc. v. Grinnell*, 951 S.W.2d 420, 425 (Tex. 1997). "Issues not expressly presented to the trial court by written motion, answer or other response shall not be considered on appeal as grounds for reversal." TEX. R. CIV. P. 166a(c).

## B.      White Lion's noncompliance was not excused

White Lion first argues that its failure to comply with the compliance plan was excused under the plan's force majeure clause, which provides that "non-compliance with one or more of the provisions of this Compliance Plan may be justified only to the extent and for the duration that non-compliance is caused by a 'Force Majeure' event . . . ." The compliance plan defines "Force Majeure" as "an event that is caused by an Act of God, labor strike, or work stoppage, or other circumstance beyond the Permittee's control that could not have been prevented by due diligence, and that makes substantial compliance with the applicable provision or provisions of this Compliance Plan impossible."

According to White Lion, the evidence that it submitted in response to the State's motion for summary judgment raised a fact issue as to whether the force majeure clause applies due to actions taken by third parties that damaged the facility. When it purchased the facility, other buyers purchased equipment located

at the facility, and the bankruptcy court required it to give those buyers access to the facility to remove the machinery and equipment that they had purchased. According to White Lion, some of those buyers caused significant damage to the property, resulting in the virtual destruction of the electrical system and disconnection of all electrical power. It estimates that repairing the electrical system, which is necessary to operate corrective equipment, will cost at least $500,000. White Lion has sought to recover damages from certain of the equipment buyers and their contractors, with varying success. It argues that, without such recoveries, the damages caused by these third parties made its "compliance with the Compliance Plan . . . a physical impossibility when it acquired the Property." It also argues that compliance was "impractical and commercially and economically infeasible." Thus, according to White Lion, there is a fact issue regarding whether its noncompliance was excused.

The State argues that White Lion did not preserve this argument for appeal because it did not mention the force majeure clause or the concept of force majeure in its response to the motion for summary judgment. The State is correct. White Lion has waived its contractual force majeure argument on appeal. *See* TEX. R. CIV. P. 166a(c); TEX. R. APP. P. 33.1(a). But White Lion's response argued that compliance was "rendered impractical and commercially and economically

16

[i]nfeasible by damages to the facility by third parties." It has therefore preserved a common-law excuse-by-impossibility argument.[5]

White Lion did not introduce any evidence that it could not control, mitigate, or, after the fact, remediate the actions of third parties at the site, even though it acknowledges that such actions ceased by August 2004, more than a decade before the trial court entered summary judgment. While it attached to its response to the motion for summary judgment pleadings from various lawsuits that it has filed against third parties, none of those pleadings was verified or sworn. At most, those documents demonstrate the nature of White Lion's claims against those parties. They do not demonstrate that the claims are true, much less that the cost of repairing the damage caused by third parties rendered compliance with the compliance plan impossible at any point in time. Nor did White Lion demonstrate that it was unable to pay the costs of the necessary repairs.

We hold that White Lion failed to raise a fact issue with respect to whether its noncompliance with the compliance plan was excused.

---

[5] The State argues that no such excuse is possible because "White Lion's defenses are limited to those set forth in the Compliance Plan and the Texas Water Code." We need not address this argument because, even assuming that the economic impossibility defense is available, White Lion has failed to demonstrate that a fact issue exists regarding that defense.

**C.** **White Lion admitted that it did not meet its financial assurance requirements**

White Lion next contends that the State "misrepresented" facts to the trial court, specifically that (1) White Lion was required to maintain $574,000 in "financial assurance," guaranteeing its performance of its obligations; (2) White Lion never provided any financial assurance to the State; and (3) White Lion was required to maintain financial assurance in the amount set by the original 1988 compliance plan, even though the costs of remaining post-closure work at the facility were much lower.

As a threshold matter, we note that the State adduced evidence that White Lion violated the compliance plan in numerous ways, not merely by failing to provide financial assurance. "When the trial court does not specify the basis for its summary judgment, the appealing party must show it is error to base it on any ground asserted in the motion." *Star–Telegram, Inc. v. Doe*, 915 S.W.2d 471, 473 (Tex. 1995). For the reasons below, we hold that the evidence supports the State's arguments in its motion for summary judgment regarding White Lion's financial-assurance obligations.

TCEQ is required to establish a compliance plan governing "compliance monitoring and corrective action for facilities that store, process, or dispose of hazardous waste in surface impoundments, waste piles, land treatment units, or landfills . . . ." 30 TEX. ADMIN. CODE § 305.401(a) (West 2015). The owner or

18

operator of an affected site must perform the duties set forth in the compliance plan. *Id.* § 335.166(2) (West 2015). He also must establish and maintain financial assurance for the corrective actions to be taken. *Id.* § 335.167(d) (West 2015).

The State sent a request for admission under Rule of Civil Procedure 198.1, asking White Lion to admit that the compliance plan "requires White Lion to provide at least $574,000 in financial assurance for the Facility." White Lion admitted this to be true. White Lion also admitted, in response to another request for admission, that it "has never obtained financial assurance for the Facility." White Lion argues, however, that the permit required a lesser amount of financial assurance than that required by the compliance plan, the permit is the controlling document, and the different amounts therefore raise a fact issue. But the Administrative Code requires White Lion to comply with both the permit and the compliance plan. *E.g.*, 30 TEX. ADMIN. CODE §§ 335.166–.167. While the permit incorporates the compliance plan as part of its terms, the plan is enforceable in its own right. *Id.* White Lion admits that the compliance plan required $574,000 in financial assurance, a requirement that it had not met.

White Lion also argues that the State "misrepresented" to the trial court that the amount of financial assurance required by the compliance plan was $574,000, the same amount set in the first compliance plan in 1988, when the actual requirement is lower. It reasons that the amount required by the Administrative

Code is "an amount no less than the current cost estimate" for closure, post closure, or corrective action. 30 TEX. ADMIN. CODE § 37.121 (West 2015). According to White Lion, the "current cost estimate" is lower than the original $574,000 figure due to changes at the facility over the years. In support, it relies on an EPA report from 2003 that purportedly concluded, as White Lion summarizes it, that "there was no imminent endangerment to public health and the environment."

But the report in question does not support such a conclusion. Rather, it indicated that contamination from the facility was "high unlikely" to impact "the drinking and agricultural water supply," but also concluded that "the plume may not be stable" and that the risk of additional exposures "is dependent on actions taken to mitigate the plume," including maintenance of the monitoring and recovery wells on-site. The undisputed evidence shows that each such well has been closed, destroyed, or abandoned. It also shows that the State correctly represented to the trial court the amount of financial assurance required by the compliance plan now in effect: $574,000. Moreover, contrary to White Lion's arguments, the "current cost estimate" is not simply the owner or operator's estimate of the costs associated with a waste site. Rather, that term is defined by statute as "[t]he most recent estimates prepared in accordance with commission requirements for the purpose of demonstrating financial assurance for closure, post

20

closure, or corrective action." 30 TEX. ADMIN. CODE § 37.11(6) (West 2015). The only manner in which either the amount of financial assurance required or the current cost estimate could be decreased is upon a request by White Lion, subject to approval by TCEQ. *Id.* § 37.151 (West 2015). White Lion has never made such a request.

The record thus conclusively shows that the compliance plan requires financial assurance of $574,000 and that White Lion "has never obtained financial assurance for the Facility."

White Lion also argues that it raised an issue of material fact regarding the calculation of civil penalties for its violation of the financial assurance requirements of the compliance plan. Specifically, it argues that Vision Metals provided financial assurance, that it assigned that financial assurance to White Lion, and that the financial assurance remained in effect until January 11, 2005. Thus, it contends that it raised a fact issue as to whether civil penalties could apply for any date before January 12, 2005.

We disagree. The evidence shows that Zurich North America, through its agent, Steadfast Insurance Company, issued an insurance policy to Vision Metals to satisfy the latter's financial assurance requirements. In April 2004, Vision Metals asked Zurich to assign its rights and obligations under that policy to White Lion. The record contains no evidence, however, that Zurich or Steadfast accepted

this assignment.[6] Critically, it also contains no evidence that anyone provided evidence of such an assignment or attempted assignment to the State. Rather, the evidence shows only that White Lion informed the State in August 2004 that "[t]he financial assurance provided by [Vision Metals] will remain in effect with Zurich North America Insurance (Policy No. PLC3572779-04) until January 11, 2005." TCEQ responded on September 20, 2004, as follows:

> We understand that financial assurance for this permit and compliance plan currently is in effect through an insurance policy issued by Zurich North America Insurance to the previous facility owner, Visions Metals, Inc. However, as we stated in our August 27, 2004 letter to you, White Lion, as the new owner and operator, is required to establish financial assurance with[in] six months of the ownership change. To date, this has not been done.

There is thus no evidence that White Lion actually established financial assurance—whether in the form of the Zurich policy or otherwise—and provided it to the State. Rather, White Lion expressly admitted that it never obtained any financial assurance for the facility.

The evidence conclusively established that White Lion assumed responsibility under the compliance plan when it became the transferee of that plan on July 23, 2004. The evidence also conclusively established that White Lion never submitted any required water samples or reports as required by the plan and

---

[6] The policy provides that it "may not be assigned to a successor owner or operator of any 'waste facility' without the consent of [Steadfast] which shall not be unreasonably withheld, delayed or denied."

22

failed to prevent the destruction, removal, or abandonment of the recovery and monitoring wells or to repair or replace the wells after they were destroyed, removed, or abandoned. Thus, White Lion was in continuous violation of the plan from that date through the date of the summary-judgment hearing on July 29, 2013, a period of 3,294 days. *See* discussion in Section E, *infra*. The evidence also conclusively showed that White Lion's deadline for establishing financial assurance was October 6, 2004. It had not established financial assurance by the summary-judgment hearing, 3,218 days later, resulting in additional violations of the plan. Under the Water Code, the civil penalty for violations of the compliance plan shall be not less than $50 nor more than $25,000 for each violation, and "[e]ach day of a continuing violation is a separate violation." TEX. WATER CODE ANN. § 7.102. The State stipulated to the minimum penalty for these violations of $50 each. The trial court thus awarded $50 per violation for a total of 6,512 violations, or $325,600. The evidence raised no question as to the dates for which the penalties should be imposed, and the trial court therefore did not err in its imposition of penalties.[7]

---

[7] On rehearing, White Lion argues that it has raised fact issues regarding whether the State (1) "failed to mitigate its damages by failing to timely file a claim against the [prior owner's] insurance policy" and (2) is estopped from recovering due to its own dilatory conduct. White Lion did not make either of these arguments in its brief on appeal. Accordingly, it has waived them. TEX. R. APP. P. 33.1(a). Even to the extent that these arguments might have been implied in White Lion's briefing, they have no merit. This is not a case for damages, but for civil penalties,

**D.     The trial court properly awarded the State unpaid hazardous waste facility fees**

According to White Lion, it never received a bill from TCEQ for permit fees for the years 2009 through 2013, nor did TCEQ make a demand for such fees until the State filed its motion for summary judgment.  White Lion also argues that the permit expired in 2009.  It concludes that these facts raise "fact questions as to whether these hazardous waste permit fees are legally valid, and in particular any fees accruing after the Permit expired in 2009."

White Lion does not attempt to explain why its obligation to pay hazardous waste facility permit fees, a statutory obligation imposed by Section 361.135 of the Health and Safety Code, could be contingent on receipt of an invoice or bill of any kind.  *See* TEX. HEALTH & SAFETY CODE ANN. § 361.135 (West 2010).  It did not raise this argument in response to the motion for summary judgment, but asserted it for the first time in its motion for new trial.  Because White Lion did not timely make this argument to the trial court in opposing the motion for summary

---

in part for White Lion's own failure to obtain an insurance policy as required by statute.  *See* 30 TEX. ADMIN. CODE § 335.167(d) (West 2015).  White Lion does not and cannot demonstrate that the State had any obligation to "mitigate" its recovery of penalties for White Lion's noncompliance.  Further, the circumstances of this case do not "clearly demand" application of the doctrine of estoppel to the State "to prevent manifest injustice," given White Lion's decade-long failure to comply with its obligations despite notices of violation and the filing of this lawsuit.  *See Tex. Dep't of Transp. v. A.P.I. Pipe & Supply, LLC*, 397 S.W.3d 162, 170 (Tex. 2013).

24

judgment, it has waived it.  TEX. R. CIV. P. 166a(c); *see also* TEX. R. APP. P. 33.1(a).

White Lion also made no argument related to the permit's 2009 expiration in response to the motion for summary judgment.  Rather, it raises those arguments for the first time on appeal.  We therefore hold that it has waived any argument based on the expiration of the permit.

## E.     The trial court did not abuse its discretion in issuing a permanent injunction

White Lion contends that the trial court abused its discretion in entering a permanent injunction because it failed to consider all of the summary judgment evidence.  Although White Lion does not specify which evidence it alleges that the trial court ignored, the essence of its argument is that it "never violated or threatened to violate the Permit or Compliance Plan and, in fact . . . did everything in its power to comply, despite other circumstances beyond [its] control that could not be prevented by due diligence."  It also argues that the EPA and a contractor hired by White Lion both determined that the contamination on the property is decreasing; therefore, according to White Lion, the trial court should not have granted an injunction.

Texas Water Code Section 7.032 gives TCEQ the right to enforce its rules and permits by seeking an "injunction or other appropriate remedy."  TEX. WATER CODE ANN. § 7.032(a) (West 2008).  When a statute provides for injunctive relief,

25

"the statute's express language supersedes the common law injunctive relief elements such as imminent harm or irreparable injury and lack of an adequate remedy at law." *West v. State*, 212 S.W.3d 513, 519 (Tex. App.—Austin 2006, no pet.); *see also Rio Grande Oil Co. v. State*, 539 S.W.2d 917, 921 (Tex. Civ. App.—Houston [1st Dist.] 1976, writ ref'd n.r.e.) (State need only meet statutory provisions of Securities Act and is not required to otherwise show probable injury); *Gulf Holding Corp. v. Brazoria Cnty.*, 497 S.W.2d 614, 619 (Tex. Civ. App.—Houston [14th Dist.] 1973, writ ref'd n.r.e.) (State need not prove irreparable injury to be entitled to injunction under Open Beach Act). Thus, "[w]hen it is determined that a statute is being violated, it is the province and duty of the district court to restrain it, and the doctrine of balancing of equities does not apply." *Gulf Holding Corp.*, 497 S.W.2d at 619.

The record demonstrates conclusively that White Lion never fully complied with the compliance plan. In addition to its failure to provide the required financial assurance, the evidence demonstrates conclusively other violations. For example, the compliance plan required White Lion to install and maintain a groundwater monitoring and "corrective action" system with specific components, including various types of wells; sample, recover, and treat groundwater; and file various reports regarding White Lion's compliance with the plan and the status of the site. But the affidavit of TCEQ employee Elijah Gandee shows that, by July 2013, the

26

"corrective action recovery and monitoring wells had been removed from the Property without authorization and/or had been improperly abandoned." The groundwater recovery and monitoring system had also been destroyed or removed, the wells had been plugged and abandoned without required approvals, and one well head had been cut off, leaving an open hole. White Lion failed to submit any of the reports required by the plan. It never took any required samples or maintained any required records. The evidence thus conclusively disproves that White Lion raised any fact issue as to whether it violated the compliance plan.

The EPA report has no bearing on White Lion's violations of the plan. The "post-judgment inspection" report prepared by White Lion's consultant was not part of the summary-judgment record. Any argument based on that report is waived. TEX. R. CIV. P. 166a(c).

We hold that the trial court did not err in entering a permanent injunction requiring White Lion to comply with the compliance plan.

## F. The summary judgment order was not overbroad

Finally, White Lion argues that the trial court erred by granting injunctive relief affecting land not subject to the compliance plan. This argument is based on a faulty premise.

The trial court's summary judgment order was a modified form of the proposed order submitted by the State. Both the proposed order and the order

27

entered by the trial court included a definition of the term "Property" as including a total of approximately 172.19 acres. The trial court, however, struck all portions of the proposed order that referenced the term "Property," other than the definition. The only injunctive relief that the trial court granted was to require White Lion to "comply with each limitation, requirement, and condition of the Compliance Plan." Thus, nothing in the judgment, other than the unused definition of "Property," mentions or affects land not covered by the compliance plan.

Because White Lion has failed to demonstrate that any issue of material fact precluded summary judgment, we hold that the trial court did not err in granting summary judgment to the State.

## Conclusion

We deny all pending motions and affirm the judgment of the trial court.


Harvey Brown
Justice

Panel consists of Chief Justice Radack and Justices Brown and Lloyd.